REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 175

September Term, 2014

_____

MONTGOMERY COUNTY,
MARYLAND, ET AL.

v.

FRATERNAL ORDER OF POLICE, ET AL.

_____

Eyler, Deborah S.,
Leahy,
Sharer, J. Frederick
          (Retired, Specially Assigned),

                                    JJ.

_____

Opinion by Eyler, Deborah S., J.

_____

Filed: April 3, 2015

Montgomery County ("the County"); Isiah Leggett, the County Executive; and Patrick Lacefield, the Director of the County's Office of Public Information ("OPI"), challenge a declaratory judgment entered by the Circuit Court for Montgomery County ruling that they acted without authority and contrary to law by using County funds to campaign for the passage of a local ballot question. The Fraternal Order of Police, Montgomery County, Lodge 35, Inc. ("the FOP"), and two police officer members, Michael Kane and Mario Mastrangelo,[1] cross-appeal from the court's denial of their claims for monetary relief.

We hold that the County acted within its powers and not illegally by spending County funds to campaign in favor of the particular ballot issue; and that Leggett and Lacefield did not violate any laws. Accordingly, we shall reverse the judgment of the circuit court. Our resolution of the appeal necessarily resolves the cross-appeal.

## FACTS AND PROCEEDINGS

The Montgomery County Code establishes the collective bargaining rights of County employees, including Montgomery County Police Department ("MCDP") officers below the rank of lieutenant. *See* Montgomery County Code ("Code") (2004), §§ 33-75 - 33-85. Prior to the events central to this case, one such collective bargaining right held by these police officers was the right to engage in "effects bargaining." "Effects bargaining" is collective bargaining about the effects of certain decisions that are reserved to the discretion of the County Executive, such as budget allocations and changes in the organizational structure of

---

[1]For ease of discussion, we shall refer to the FOP and the officers collectively as the FOP.

County agencies. *Fraternal Order of Police Lodge 35 v. Montgomery Cnty.*, 436 Md. 1, 5 (2013).

On July 19, 2011, the Montgomery County Council unanimously passed Bill 18-11, amending the Code to eliminate effects bargaining for MCPD police officers below the rank of lieutenant. Leggett signed Bill 18-11 into law on August 1, 2011. Unhappy with the bill, the FOP, as the exclusive bargaining representative for the affected MCPD police officers, petitioned the bill to referendum. Its petition was certified by the Montgomery County Board of Elections on November 18, 2011. As a result, Bill 18-11 was suspended from taking effect "until thirty days after its approval by a majority of the registered voters voting thereon." Montgomery County Charter ("the Charter") § 115.[2]

The referendum on Bill 18-11 was designated to appear on the November 6, 2012 General Election ballot as "Question B." The ballot question asked: "Shall the Act to modify the scope of collective bargaining with police employees to permit the exercise of certain management rights without first bargaining the effects of those rights on police employees become law?" A "Yes" vote would approve Bill 18-11 and allow it to take effect.

---

[2]The County and the staff director on the County Council brought an action in the Circuit Court for Montgomery County challenging the certification of the FOP's petition. The circuit court ruled in favor of the County, concluding that the petition should not have been certified due to irregularities in the signatures and circulator affidavits. The FOP appealed that decision. The Court of Appeals issued a writ of *certiorari* before consideration in this Court, and reversed, upholding the certification. *Fraternal Order of Police Lodge 35 v. Montgomery Cnty.*, 427 Md. 522 (2012) (*per curiam* order reversing decision of the circuit court); 436 Md. at 1 (opinion explaining the Court's reasoning).

Early in the summer of 2012, the FOP launched a campaign against Question B. In August of 2012, Leggett, acting in his capacity as County Executive, decided that the County would mount its own campaign to encourage the electorate to vote "Yes" on Question B. Leggett directed Lacefield, as Director of the OPI,[3] to coordinate the Question B campaign and authorized him to spend up to $200,000 in funds appropriated for OPI's fiscal year 2013 budget for that purpose. OPI is an office in the executive branch of the County government. *See* Code, § 1A-201(a). Its responsibilities include "[s]erv[ing] as a focal point for communications with citizens and community organizations"; [e]stablish[ing] and maintain[ing] a public information program"; and "[c]arry[ing] out related matters as may be assigned." Code § 2-64H.

Lacefield obtained legal advice from the County Attorney about the propriety of the County's using funds from OPI's budget for the Question B campaign. In a "Memorandum" dated September 19, 2012, and entitled "Government Speech - Effects Bargaining Referendum," the County Attorney reiterated prior oral advice he had given Lacefield on that matter. He opined that a County-funded campaign to advocate for a "Yes" vote on Question B would be "legal and appropriate" because the County is "entitled to engage in speech supporting and explaining its policies, including speech that advocates support of a ballot measure." The County Attorney also advised that state and local prohibitions against County employees' engaging in "political activity" during work hours are directed toward "partisan

---

[3]Lacefield is a non-merit employee.

political activity," *i.e.*, actions taken for or against a candidate or a slate of candidates associated with a particular political party, and do not apply to activities in support of a ballot measure.[4]

In the Question B campaign, Lacefield used excerpts from the record of the County Council hearings on Bill 18-11, particularly the testimony of the Chief of Police and MCPD lieutenants espousing that effects bargaining was harming the operation of the MCPD, to create advocacy material, such as mailers, posters, flyers, yard signs, bumper stickers, and advertising for County buses. He also spoke with some of the MCPD managers about their views on effects bargaining. A "fact sheet" prepared by OPI about Question B provides a useful summary of the County's position. It states that effects bargaining means that the Chief of Police must bargain with the FOP on "the effects of *any* and *all* management decisions" and that this interferes with his ability to run the MCPD in the most "efficient and productive way." (Emphasis in original.) The "fact sheet" notes that the County's police force is the only one in Maryland with the right to effects bargaining and that no other County employees have this right in their union contracts. It emphasizes that eliminating effects bargaining is not an attack on unions and that the FOP will remain entitled to bargain on wages, benefits, hours, working conditions, and leave. It gives examples of how effects

---

[4]Also, on October 16, 2012, the County Attorney forwarded to Lacefield a November 29, 2010 email from Jeffrey Darsie, the Assistant Attorney General representing the State Board of Elections, pertaining to County advocacy on a prior ballot measure. Darsie had opined in that email that the campaign finance laws in the Election Law Article do not apply to the County.

bargaining was hampering the Chief of Police in his management of the MCPD, including that a proposed new "Use of Force" policy had been sent to the FOP for approval in June 2008 but remained pending years later.

In mid-September of 2012, the County began featuring a "Vote for Question B" graphic on the homepage of its website. Visitors who clicked on that graphic were directed to a separate page that gave additional information advocating for the passage of Question B. In addition, the County included advocacy materials on Question B in its electronic newsletter, "the Paperless Airplane," which was disseminated to about 125,000 County residents five times between September 14, 2012, and election day.

By mid-October of 2012, the County had installed on the interiors and exteriors of all County-operated Ride-On buses signs emblazoned with some version of the following statement: "Who Do <u>You</u> Think Should Run the County Police? The Police Chief or Union Leaders? Vote FOR Question B." The signs were marked with the County seal and "Montgomery County Office of Public Information."[5]

---

[5]The FOP sought to place its own placards advocating against Question B on the County buses as well. The County initially denied its request on the basis that it only permitted commercial and County advertisements on its buses. *See* Code § 2-57 ("Only commercial advertisements, *or County government notices that inform the public of a County program or service*, may be placed on or in public transit buses owned or operated by the Department [of Transportation]") (emphasis added). The County subsequently changed course after being contacted by the ACLU. By then it was too late for the FOP to place its signs on the County buses.

The County also expended OPI funds on a mailing campaign urging recipients to "Vote for Question B." It hired an outside consulting firm to design the two mailers, identify target recipients, and obtain mailing lists. It paid the firm $13,095. In the week before the election, the County sent the two mass mailings to more than 163,000 County households, at a cost of over $90,000.

Aside from the outside consulting firm, most of the work on the County's campaign in favor of Question B was performed by County employees. OPI staff designed signs, bumper stickers, t-shirts, and flyers. Employees in the County Department of General Services ("DGS") distributed signs and posters to County facilities, including libraries and recreation centers.

Leggett personally reached out to local Democratic and Republican party officials, speaking to the Democratic Party Ballot Question Advisory Committee, the Democratic Central Committee, and the Republican Central Committee. Both parties supported passage of Question B.

In all, the County spent $122,350.17 in OPI funds on the Question B campaign. This sum exceeded 10% of OPI's budget for fiscal year 2013.

During the campaign, the FOP challenged the County's right to spend public funds on a political campaign and argued that the County was making false and misleading statements about effects bargaining. On September 20, 2012, it filed a complaint with the County Inspector General. The Inspector General did not respond until November 8, 2012,

6

two days after the election. He advised the FOP that the County's activities were consistent with the legal advice it had received from the County Attorney and were taken in good faith. With respect to the allegation that the County's campaign was misleading, the Inspector General advised that his office had reviewed the complained of statements and had found all of them to be reasonable.

In the meantime, on October 17, 2012, the FOP filed a complaint about the County's activities with the Office of the State Prosecutor. By letter of October 22, 2012, the State Prosecutor advised Leggett and the County Council that his office had received a complaint that the County was expending public funds and using County employees to push for passage of Question B; that this conduct might be a violation of state campaign finance laws; and that his office would be opening an investigation into these activities to determine if any criminal violations had occurred.

The County Attorney immediately responded to the State Prosecutor's letter, explaining his opinion that the County was not subject to state election laws governing campaign finance activity. Thereafter, the State Prosecutor closed his investigation and asked the Office of the Attorney General to render an opinion on the legality of the County's campaign. No such opinion was issued.

The day before the election, the FOP filed the instant action against the County, Leggett, and Lacefield. It alleged generally that the County had spent public funds to campaign for the passage of Question B; had directed certain of its employees to participate

7

in the campaign during work hours; had hired outside individuals to distribute campaign materials; and that all these activities could "greatly diminish the likelihood that Question B [would] be defeated." The FOP claimed that approval of Question B, which would result in Bill 18-11 taking effect, might "reasonably [cause the FOP to] sustain pecuniary losses due to increased and protracted litigation over whether disputed issues with the County are mandatory subjects of bargaining or effects on employees of the employer's exercise of an employer right."

The FOP further alleged that the County's use of public funds to campaign for passage of Question B was "*ultra vires* and without any authority of law" because it was not a proper governmental function; the County was neither expressly nor impliedly authorized by the Home Rule Amendment or the Express Powers Act to advocate on a ballot question; the expenditures should have been made through a "ballot issue committee" registered with the State Board of Elections ("State Board"), pursuant to Md. Code (2003, 2010 Repl. Vol., 2012 Supp.), sections 1-101(f) and 13-202 of the Election Law Article ("EL"); and the County had not registered any such committee. It alleged, moreover, that the County had no authority to direct County employees to work on the campaign and, in fact, those employees are prohibited by State and local law from engaging in political activity while on the job. The FOP sought a judgment declaring that the County was acting illegally; holding Leggett and Lacefield personally liable for the "wrongful and illegal expenditure of public funds";

8

ordering Leggett and Lacefield to reimburse the County, with interest, for the wrongful expenditures; and awarding it attorneys' fees and costs.

On November 6, 2012, the voters in Montgomery County approved Question B by a margin of 58.05% to 41.95%. Bill 18-11 became law as a result.

Thereafter, the FOP amended its complaint to reiterate its prior allegations and set forth ten counts.[6] In Counts 1 through 6, it sought declaratory and injunctive relief against Leggett and Lacefield (Counts 1, 2, and 3) and the County (Counts 4, 5, and 6). It alleged that Leggett and Lacefield were a "political committee" within the meaning of the Election Law Article and that they had failed to comply with the requirements imposed upon political committees in the campaign finance title of that article. It sought a declaration that Leggett and Lacefield had violated those laws and directing them to comply with them (Count 1). It claimed that Leggett and Lacefield had engaged in "electioneering and campaign activities" during work hours in violation of Md. Code (1957, 2011 Repl. Vol.), section 13-105 of Article 24 (Count 2); and in violation of sections 405, 406, and 408 of the Charter, section 19A-14 of the Code, and section 3-8 of the County personnel regulations ("MCPR") (Count 3).

---

[6]The FOP subsequently filed two "amendments to" its amended complaint. These "amendments" were not styled as amended complaints, although that is what they were. All references to the "amended complaint" in this opinion is to the amended complaint as amended by these subsequent filings.

9

The FOP again alleged that the County had no legal authority to engage in electioneering and campaign activities, and sought a declaration to that effect (Count 4). It also sought a declaration that the County, through Leggett and Lacefield, illegally engaged in electioneering and campaign activities in violation of the campaign finance title of the Election Law Article (Count 5) and in violation of the above-referenced provisions of the Charter, the Code, and the MCPR (Count 6).

In the remaining counts, the FOP sought damages. It alleged in Counts 7 and 8 that Leggett and Lacefield had engaged in "misconduct in office" in violation of Article 6 of the Maryland Declaration of Rights, and that their actions to promote the passage of Question B were taken with willful and reckless disregard for the law and amounted to malfeasance. The FOP asked the court to find that these actions were illegal, order Leggett and Lacefield to personally "pay . . . and reimburse[] [the County] for the cost of all electioneering and campaign activity" relative to Question B, and order an accounting. In Count 9, captioned "Taxpayer Cause," the FOP alleged that Leggett and Lacefield had engaged in illegal electioneering activity with "tax-derived funds" and by doing so had caused an increase in the FOP's taxes. In Count 10, the FOP sought damages against the County, Leggett, and Lacefield for violation of its state constitutional rights.

Finally, the FOP made a general request for attorneys' fees and costs.

The County, Leggett, and Lacefield moved to dismiss the amended complaint, arguing, among other reasons, that the FOP lacked standing and that its action was barred by

10

the doctrine of laches. They also moved for summary judgment. The FOP filed a cross-motion for summary judgment. The motions were denied and the case was tried to the court for nine days, from February 18 to February 28, 2014. Most of the testimony and other evidence concerned the nature of the County's campaign in favor of Question B.

On March 21, 2014, the court issued a memorandum opinion and order. In its "Findings of Fact," it found that the County, Leggett, and Lacefield had "engaged in electioneering and conducted a political campaign" advocating for the passage of Question B and had spent at least $122,000 on that campaign. The court found that the campaign had used County employees from OPI and DGS and other departments. The court summarized the campaign activities as follows:

> [T]he County's political campaign included two targeted mass mailings during the week before the election; advertising on County Ride-On buses; advocacy on the County's website; hiring a political consultant; hiring individuals to disseminate campaign material at the polls during early voting and on Election Day; using County employees, while on the clock, to design and produce campaign material and to disseminate posters, flyers and yard signs; and using County email lists to disseminate campaign materials to voters.

The court found that Leggett "subjectively believed, in good faith, that effects bargaining was deleterious to the efficient operations of the police force" and that all of the County's statements about Question B and effects bargaining were "true" or made without an intent to mislead. It further found that, "as a direct consequence of the County's campaign activities on Question B, the FOP incurred expenses over and above the expenditures that it otherwise would have spent to promote voter disapproval of Question B." It did not quantify

11

how much more the FOP had spent than it otherwise would have spent, finding only that the FOP had spent a total of $169,619 on its campaign against Question B.[7]

In its "Conclusions of Law," the court opined that the FOP had standing to bring suit because it had "suffered some special damage, 'differing in character and kind from that suffered by the general public' as a result of the repeal of effects bargaining" (quoting *Weinberg v. Kracke*, 189 Md. 275, 280 (1947) (footnote omitted)), and that the County had not made a showing of unreasonable delay or prejudice sufficient to support its laches defense.

Turning to the merits of the FOP's claims, the court analyzed the right to referendum under state law, concluding that a ballot question arising from a referendum petition does not differ in any significant respect from "any another contested, partisan election." It rejected the County's argument that under the "government speech doctrine" it was entitled to speak on topics of public importance to its function and role as a government and that Question B was such a topic. The court concluded that that doctrine shields state and local governments from First Amendment challenges to their use of a public forum to advocate for policies supported by the government but is not a source of power for the "unlimited unregulated spending of public funds by a governmental entity to influence a contested election."

_____

[7]The court broke down that amount as follows: $110,000 for media consulting and advertising fees; $50,000 in legal fees; $6,848 for advertising on taxis; and $2,771 for press conferences.

12

Emphasizing that, as a charter county, the County derives its power from the State, the court concluded that, although the County has "inherent power" to "appropriate funds for any public purpose," "[e]ngaging in political electioneering simply is not 'essential or indispensable' to running a municipal government." (quoting *River Walk Apartments, LLC v. Twigg*, 396 Md. 527, 543 (2007)). The court concluded that the County lacks inherent power to engage in a political campaign, and is not granted such power by the Express Powers Act; therefore it has no power to engage in a political campaign, and its doing so was *ultra vires*.

The court analyzed out-of-state cases, most of which were decided in the 1970s and 1980s, and found they supported its legal conclusions. These cases, some of which we shall discuss later in this opinion, hold in broad terms that it is not an appropriate municipal function for a local government to weigh in on one side of a contested ballot measure. They distinguish between government communications designed to inform the public about government policies and programs and government communications that "proselytize and try to influence the outcome of an election contest." The court found that, in the instant case, the County's Question B campaign was not "informational," but was "partisan and political."

The court determined that Leggett and Lacefield were subject to the campaign finance and reporting laws in Title 13 of the Election Law Article, opining that these laws apply to the "campaign activities of all persons, regardless of their office." It found that Leggett and Lacefield were a "political committee," as that term is defined in EL section 1-101(gg), and

13

that they had failed to register with the State Board or to otherwise comply with the campaign finance reporting requirements in the EL Article. Finally, the court found that Leggett and Lacefield improperly directed County employees to participate in the campaign for Question B during work hours, in violation of section 13-105 of Article 24, the Charter, the Code, and the MCPR.

The court declined to award monetary relief, stating:

[Counts 7, 8, 9 and 10] have as a common element the notion that Leggett and Lacefield committed wrongdoing under color of their office and should personally be held to account in some form of monetary relief. Assuming, without deciding, that these claims have validity, the court nonetheless declines to require either defendant to personally pay any form of monetary award. In the court's view, they are entitled to at least "qualified immunity" to the extent the plaintiffs seeks to hold them personally liable. The conduct of both individual defendants involved performance of discretionary duties and did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." [*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).] This is a case of first impression. "If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." [*Id.*]

(Footnotes omitted.) On these bases, the court dismissed, with prejudice, Counts 7, 8, 9, and 10. It directed the parties to submit a draft order to that effect and a draft declaratory judgment.

On April 1, 2014, the court entered its "Declaratory Judgment." As relevant here, it "Ordered, Adjudged, Decreed, and Declared" that Leggett and Lacefield were a "political committee" that was required to comply with the campaign finance and reporting requirements of the Election Law Article, but failed to do so (Count 1); that Leggett and

14

Lacefield caused County employees to participate in political activities during work hours in violation of section 13-105 of Article 24 (Count 2) and in violation of the Charter, the Code, and the MCPR (Count 3); that the County had no legal authority to engage in electioneering and that its Question B campaign was *ultra vires* (Count 4); and that the County was not subject to Title 13 of the EL Article (Count 5), but was subject to and violated the Charter, the Code, and the MCPR (Count 6). The court ordered the County to pay the costs of the action.

The court entered a separate "Order" dismissing Counts 7, 8, 9, and 10, with prejudice.

The County, Leggett, and Lacefield noted a timely appeal, presenting the following questions for review, which we have reordered and rephrased:

I. Did the trial court err in ruling that the FOP had standing to sue?

II. Did the trial court err in ruling that the FOP's suit was not barred by the doctrine of laches?

III. Did the trial court err in ruling that the County's campaign on Question B was *ultra vires* and illegal?

IV. Did the trial court err in ruling that Leggett and Lacefield violated Title 13 of the EL Article?

V. Did the trial court err in ruling that the County, Leggett, and Lacefield violated state and local laws by directing County employees to participate in campaign activities during working hours?

VI. Did the trial court err in ruling that the prerequisites to maintaining a suit under EL section 12-202 were not applicable to the FOP's suit and therefore did not need to be satisfied?

15

The FOP noted a timely cross-appeal. It presents four questions for review, which we have combined and rephrased as one: Did the trial court err by dismissing Counts 7, 8, 9, and 10 of the amended complaint in which it sought monetary damages and attorneys' fees? [8]

We shall include additional facts as pertinent to the issues.

## STANDARD OF REVIEW

Our review of a judgment in a case that was tried to the court is governed by Rule 8-131(c). We "review the case on both the law and the evidence" and "will not set aside the judgment of the trial court on the evidence unless clearly erroneous" with "due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131(c). "The deference shown to the trial court's factual findings under the clearly erroneous standard does not, of course, apply to legal conclusions." *Griffin v. Bierman*, 403 Md. 186, 195 (2008) (quoting *Nesbit v. Gov't Employees Ins. Co.*, 382 Md. 65, 72 (2004)). "We review *de novo* the circuit court's application of the law to the undisputed facts before it." *PNC Bank, Nat'l Ass'n v. Braddock Props.*, 215 Md. App. 315, 322 (2013).

## DISCUSSION

### APPEAL

### I.

### *Standing*

[8]The Mayor and City Council of Baltimore; Anne Arundel County; and Prince George's County have filed an *amicus* brief with this Court in support of the County. Their brief addresses appeal Questions III, IV, and V.

The County, Leggett, and Lacefield contend the circuit court erred in denying their motion to dismiss the amended complaint for lack of standing. They assert that "[a] plaintiff has no standing to challenge a county's actions as illegal where the complaint amounts to nothing more than an abstract, generalized interest in the county's compliance in the law, which is shared by all members of the general public." They emphasize that the FOP's claim is that the County, through Leggett and Lacefield, illegally advocated for the passage of a ballot question, and that this challenge was "not dependant [sic] upon the substance of the ballot question." With respect to Counts 2, 3, and 6, the County makes the additional argument that the FOP lacks standing to sue for violations of state and local laws that protect government employees from being made to engage in political activity.

The FOP responds that it has standing because it is the exclusive bargaining representative for the MCPD and passage of Question B resulted in the loss of a significant bargaining right and was a direct injury to it and its members. The FOP maintains that it owed its members a fiduciary duty to advocate on their behalf against Bill 18-11 and Question B, and, as a result of the County's *ultra vires* campaign, it spent significantly more money than it otherwise would have spent on its opposition campaign. According to the FOP, both these injuries were different in character and kind than that suffered by the general public and gave it standing to sue for declaratory and monetary relief. With respect to Counts 2, 3, and 6, the FOP asserts that the County's unlawful use of County employees to

17

carry out its campaign likewise caused it the same pecuniary harm, and therefore it has standing to sue for violation of those laws as well.

The prerequisites for standing in a declaratory judgment action are no different than in any civil action. *See Comm. for Responsible Dev. on 25th Street v. Mayor & City Council of Baltimore*, 137 Md. App. 60, 72 (2001).

> "Generally, whether a party has standing to sue depends on whether that party has an actual, real and justiciable interest susceptible of protection through litigation." *Mayor and City Council of Ocean City v. Purnell-Jarvis, Ltd.*, 86 Md. App. 390, 403, 586 A.2d 816 (1991) (citing 1A C.J.S. *Actions* § 60(a) (1985)). A person has "standing in the sense that [he or she] is entitled to invoke the judicial process in a particular instance." *Adams* [*v. Manown*], 328 Md. [463,] 480 [(1992)], 615 A.2d 611. Standing to obtain declaratory relief is important because a declaratory judgment action "calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 242, 57 S.Ct. 461, 81 L.Ed. 617 (1937).

*Howard v. Montgomery Mut. Ins. Co.*, 145 Md. App. 549, 556 (2002).

In reliance upon *Kendall v. Howard County*, 431 Md. 590 (2013), the County argues that the FOP's suit "seeks to redress what is claimed to be a public wrong" and therefore the FOP "must . . . demonstrate that [it] suffered some special damage from such wrong differing in character and kind from that suffered by the general public." 431 Md. at 593 (quoting *Weinberg*, 189 Md. at 280). In *Kendall*, two Howard County residents filed suit against that county seeking a declaratory judgment that a "laundry list" of resolutions, ordinances, zoning decisions, and administrative actions violated the Howard County Charter. *Id.* at 604. The plaintiffs sought a declaration that those resolutions and ordinances, all of which concerned

18

land use or zoning, were void *ab initio*, and also sought to enjoin Howard County from enforcing them. The plaintiffs' core argument was that Howard County had taken action administratively, rather than legislatively, and in doing so had deprived them of their right to petition those acts to referendum.

Howard County moved to dismiss the complaint for lack of standing. The plaintiffs responded that the Howard County charter grants to "the people," *i.e.*, residents of Howard County, the right to referendum and therefore any Howard County resident has standing to sue to redress a violation of the charter impairing that right. The circuit court dismissed the complaint and this Court affirmed on appeal. *See Kendall v. Howard Cnty.*, 204 Md. App. 440, 453 (2012).

The Court of Appeals granted a petition for writ of *certiorari* and affirmed. It explained that to have standing the plaintiffs had to allege that they had suffered some "special damage" arising from Howard County's allegedly unlawful actions. They could have done so in one of two ways. First, because the allegedly unlawful enactments all pertained to land use or zoning, they could have shown "property owner standing" as owners of property in close proximity to properties affected by the enactments. Second, if the allegedly illegal acts had the potential to cause them pecuniary harm or an increase in their taxes, they could have shown "taxpayer standing." The plaintiffs did neither. They did not allege that they owned property in proximity to affected land or that they suffered pecuniary harm as taxpayers. In fact, as to the latter, they "expressly eschewed any reliance on taxpayer

19

standing." *Id*. at 607. The Court rejected the plaintiffs' arguments that they had standing under the Howard County charter independent of any "special damage" sustained and because Howard County's allegedly wrongful acts infringed on their right to vote.

The County asserts that, like in *Kendall*, the FOP seeks to redress a "public wrong," *i.e.*, the County's use of public funds to campaign in favor of a ballot question, and that it has not satisfied the special damage requirement because its claims focus on the illegal process, not the outcome, *i.e.*, the passage of Question B and the elimination of effects bargaining for MCPD officers below the rank of lieutenant. In other words, because the FOP's claims of illegality do not depend upon the substance of Question B, its grievance is too generalized to create standing.

In response, the FOP relies upon two cases in which the Court of Appeals has held that a union had standing to challenge allegedly unlawful government action that had the potential to diminish the bargaining power of the union's members. In *Baltimore Teachers Union v. Board of Education*, 379 Md. 192 (2004), the Court held that the Baltimore Teachers Union had standing to sue the State Board of Education for declaratory and injunctive relief related to the Board's efforts to enter into a contract with a private corporation to operate certain public schools in Baltimore City. The Court emphasized that the union was the "designated collective bargaining agent" for all employees of the Baltimore City school system and owed its members a fiduciary duty to advocate on their behalf. *Id*. at 199. If the actions it challenged in its lawsuit had come to fruition, that would have had

20

the effect of diminishing the union's bargaining power by permitting certain public schools to operate outside of the labor agreement. The Court held that this was a harm to the union that was sufficient to give it standing to sue to prevent the Board of Education from going forward with the contract.

In *Patterson Park Public Charter School, Inc. v. Baltimore Teachers Union*, 399 Md. 174 (2007), the Court held that the Baltimore Teachers Union had standing to intervene in an administrative action concerning the right of certain charter schools to obtain waivers of a state law requiring that all charter school employees be public school employees with the right to collective bargaining. Recognizing that the union had a fiduciary obligation to advocate against the waivers on behalf of its members, and that the effect of the grant of waivers would be the reduction in the size of the union's bargaining unit, the court held that the union had a "sufficient interest in the proceedings to satisfy standing requirements." *Id.* at 208.

We conclude that in light of the FOP's fiduciary obligation to its members to advocate against Question B, the passage of which would diminish their collective bargaining rights, the County's campaign in support of Question B negatively affected the FOP in a way that differed in character and kind from any harm suffered by members of the public generally. The County, as the manager of the MCPD, and the FOP, as the bargaining representative of the officers, were the interested parties in the debate over effects bargaining. The County entered into the debate because it knew that the FOP intended to campaign against Question

21

B and it wanted to offer an opposing viewpoint. Unlike in *Kendall*, in which the plaintiffs asserted a generalized harm arising from Howard County's allegedly unlawful actions, here the FOP alleged (and proved) that it expended more money on its campaign opposing Question B than it otherwise would have spent had the County not entered into the debate. The additional expense was a type of harm that differed in character and kind than that suffered by the public in general.

This is equally so with respect to Counts 2, 3, and 6, all of which alleged violations of State and local laws prohibiting County employees from engaging in "political activity" during work hours. The FOP was not required to show that its members were made to engage in political activity in violation of those laws if it sufficiently alleged that it was harmed by the violation of those laws. The County's use of its own employees to design, print, and distribute its campaign materials was a benefit to its campaign no different in character than the County's expenditure of OPI's budget on its campaign. For all of these reasons, the FOP's interest in the outcome of Question B, which necessitated its entry into the public debate on that ballot measure, gave it a special interest in the lawfulness, *vel non*, of the County's campaign, and was sufficient to confer standing.

## II.

### *Laches*

The County, Leggett, and Lacefield contend the circuit court erred in ruling that the FOP's suit was not barred by the doctrine of laches. Under the authority of *Ross v. State*

22

*Board of Elections*, 387 Md. 649 (2005), they argue that the FOP was required to file its action expeditiously once it was aware of any conduct it believed to be in violation of the election laws, but did not file suit until more than a month after it learned that the County was using public funds on the Question B campaign. They argue that this delay was unjustified and prejudicial to them and mandated dismissal of the amended complaint.

The FOP responds that *Ross* is inapposite because, unlike the plaintiff in that case, it (the FOP) did not seek to overturn the election result. Consequently, its claims against the County and the individual defendants are not subject to the general rule that claims relative to an election must be brought "expeditiously"; and, in any event, the County did not show any prejudice flowing from any delay in filing suit.

The plaintiff in *Ross* was the Green Party candidate for a seat on the Baltimore City Council. The Democratic Party candidate, Paula Branch, filed her certificate of candidacy with the State Board more than a year before the election. Two campaign finance entities registered with the State Board to raise funds on her behalf. During the year and a half before the election, both of those entities "repeatedly failed to file the campaign finance reports" required by EL section 13-304 and the State Board served show cause notices on them as a result. 387 Md. at 654. Twenty days before the election, *The Baltimore Sun* ran an article mentioning that Branch's campaign finance entities were deficient in their filings and that Ross was "raising it as an issue in the campaign." *Id*. at 655. Under EL section 13-332, the failure to file campaign finance reports could have disqualified Branch as a

23

candidate for office. Eleven days before the election, Ross's campaign contacted the State Board and asked it to discuss the issue of Branch's possible disqualification at its next meeting, scheduled to take place four days later, which was exactly one week before the election. The State Board took up the issue at the meeting but "declined to rule." *Id*.

Branch won the election by a margin of 79.79% to 12.22%. Three days later, Ross filed in the circuit court a petition for immediate injunctive and declaratory relief, naming the State Board and Branch as defendants. Among other things, he sought an injunction to prevent Branch from being sworn into office and a declaration that Branch was ineligible as a candidate, that the results of the election were void, and that a new election was required to be held. The circuit court granted summary judgment in favor of the State Board and Branch, concluding that Ross was required to file suit within three days after the ballot was certified, pursuant to EL section 9-209.

The Court of Appeals affirmed, but on the alternative basis that Ross's claims were barred by laches. As relevant here, the Court determined that Ross's claims were not governed by EL section 9-209, but were governed by EL section 12-202, which "provides for a ten-day 'window' for seeking judicial redress for an act or omission that violates the Election Law Article and *has or would change the outcome of the election* once the registered voter knows of it." *Id*. at 667-68 (emphasis added). The Court held that because Ross knew, no later than the date of *The Baltimore Sun* article, that the campaign finance

24

entities associated with Branch had failed to file required campaign finance reports, but did not file his complaint until more than ten days later, his complaint was barred by laches.[9]

The Court emphasized that the defense of laches applies when there is an "'unreasonable and unjustifiable delay'" in bringing an action and the delay prejudices the defendant. *Id*. at 669. In a purely equitable action, a "'lapse of time shorter than the period of limitations may be sufficient to invoke the doctrine.'" *Id*. (quoting *Buxton v. Buxton*, 363 Md. 634, 645 (2001)). The Court was persuaded by the reasoning of numerous federal court decisions holding that, when a plaintiff's claim arises from the election law, it must be brought expeditiously so as to allow for a pre-election adjudication whenever possible. It concluded that Ross had opted to take a "'wait and see'" approach, thereby prejudicing Branch, who had relied on her certification by the State Board, and, importantly, prejudicing the voters who had elected Branch by an overwhelming majority. On this basis, the Court held that Ross's action was barred because he could have and should have filed it prior to the election.

We return to the case at bar. The circuit court found that the County did not make a showing of "unreasonable delay and prejudice." This finding was neither clearly erroneous nor contrary to law. The FOP filed complaints with the Office of the State Prosecutor and

_____

[9]Ross argued that the ten-day window did not begin to run until the State Board declined to rule on Branch's eligibility at its meeting the week before the election and ten-days before Ross filed suit. In a footnote, the Court opined that even if it had agreed with Ross on this point, it nevertheless would have held that his suit was barred by laches.

the County Inspector General as soon as it became aware of the County's Question B campaign. After both of those avenues proved unsuccessful, the FOP sought declaratory and monetary relief premised on its claim that the County's campaign was illegally financed, causing harm to its members. The FOP did not seek to undo the passage of Question B, however. The pre-election adjudication in *Ross* was essential to prevent prejudice to the allegedly ineligible candidate and to the voters who elected her. Here, in contrast, the central issue of the legality, *vel non*, of the use of public funds on a ballot issue campaign was susceptible of adjudication post-election without prejudice to the County or Leggett or Lacefield. Moreover, this is not a purely equitable action, as the FOP sought monetary damages. The circuit court did not err in denying the motion to dismiss on the basis of laches.

**III.**

*The County: Ultra Vires/Illegal Acts*

As noted, the trial court ruled that the powers the County derived from the State do not include the power to engage in a political campaign on a contested ballot issue; therefore its doing so was *ultra vires* and illegal. It concluded that while the County has the power to spend properly appropriated funds, it only may do so for purposes "'essential or indispensable' to running a municipal government," and that a campaign on a ballot measure is neither. The court made a related determination that the County is not subject to the campaign finance laws in the Election Law Article and this shows that the General Assembly

26

intended that local governments would not have any role whatsoever in election politics.

The County asserts that under the government speech doctrine it has the right to advocate about a non-partisan issue affecting governance, and that its ability to efficiently manage its police force is quintessential government speech. It maintains that it has the implied and inherent power to appropriate funds *and* to use those funds -- here, money in OPI's annual budget -- for a governmental purpose, and that advocacy in favor of Question B was undertaken for a governmental purpose. Thus, it properly used OPI funds for a governmental purpose, and, absent an express prohibition against its use of the funds in that manner, it had the power to do so. It argues that the negative implication the court drew from the absence of campaign finance laws governing the County does not comport with basic tenets of statutory construction.

The FOP responds that the County's authority to act in any area must be derived from a power enumerated in the Express Powers Act; and because that Act does not authorize a charter county to campaign on a contested ballot issue, the County's actions were *ultra vires*. It maintains that, even if the County has the implied power to appropriate funds and use them to promote its governmental policies, that power did not extend to advocacy on Question B because a bill petitioned to referendum is "not a law nor policy of the County" unless and until it is approved by the voters. Finally, the FOP reiterates that if the General Assembly had intended for local governments to have the power to use public funds to campaign on contested ballot issues, it would have regulated that conduct in the Election Article.

27

## A.

## Government Speech

The FOP argued below, and repeats on appeal, that when the County takes a side in a political contest over a ballot measure, that "threatens the integrity of the electoral process and interferes with the right of the [County voters] to govern [through the right to referendum]." The trial court was persuaded by this argument, opining that the "government's entry into a political fray threatens the integrity of our republican form of government" and characterizing an election that "takes place in the shadow of omniscient government" as a "mockery" and a "sham." (Quoting *Palm Beach County v. Hudspeth*, 540 So.2d 147, 154 (Fl. Dist. Ct. App. 1989)). *See also Burt v. Blumenauer*, 699 P.2d 168, 175 (Or. 1985) (affirming intermediate appellate court's reversal of grant of summary judgment in favor county executive, two county commissioners, and health department officials who campaigned against a measure to end fluoridation of the county's water supply, and emphasizing that government advocacy in a political contest can be coercive); *Stanson v. Mott*, 551 P.2d 1, 9 (Cal. 1976) (reversing dismissal of complaint against the director of the California department of parks and recreation for an allegedly illegal expenditure of $5,000 in public funds to support a bond initiative to purchase park lands; holding that if the director used public funds to promote the bond bill, his expenditure was illegal because "the government may not 'take sides' in election contests or bestow an unfair advantage on one of several competing factions,"; but holding that director only would be personally liable if

28

he acted in bad faith); *Anderson v. City of Boston*, 380 N.E.2d 628, 639 (Mass. 1978) (holding that the city lacked authority to appropriate money to expend for the purpose of urging voters to support a proposed amendment to the Massachusetts constitution pertaining to property tax assessments because such expenditures were inconsistent with the state's comprehensive campaign finance regulations and holding that the city's first amendment right to speak was not abridged because the state had a legitimate "interest in assuring that a dissenting minority of taxpayers is not compelled to finance the expression on an election issue of views with which they disagree").

As the County points out, however, more recently the United States Supreme Court has held that it is not a violation of the Free Speech Clause of the First Amendment for a government to use taxpayer funds to subsidize its own "speech" advocating its own policies. *See Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550 (2005); *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) ("government speech is not restricted by the Free Speech Clause"). Although the instant case does not present a First Amendment challenge to the County's speech, these cases are highly instructive.

In *Johanns*, the Supreme Court outlined the contours of the government speech doctrine. That case was a challenge to the Beef Promotion and Research Act of 1985 ("the Beef Act"), in which Congress announced a federal policy of promoting beef products and funded that promotion through an assessment on cattle sales and importation. Two associations whose members paid the assessment sued, arguing, *inter alia*, that the Beef Act

29

violated their First Amendment rights by compelling them to subsidize speech they found

objectionable.[10]  The Supreme Court rejected that argument, opining:

> Our compelled-subsidy cases have consistently respected the principle that
> "[c]ompelled support of a private association is fundamentally different from
> compelled support of government." ***"Compelled support of
> government"—even those programs of government one does not
> approve—is of course perfectly constitutional, as every taxpayer must attest.
> And some government programs involve, or entirely consist of, advocating
> a position.*** "The government, as a general rule, may support valid programs
> and policies by taxes or other exactions binding on protesting parties. ***Within
> this broader principle it seems inevitable that funds raised by the government
> will be spent for speech and other expression to advocate and defend its own
> policies."*** We have generally assumed, though not yet squarely held, that
> compelled funding of government speech does not alone raise First
> Amendment concerns.

*Id*. (citations omitted) (emphasis added).  The Court held that the Beef Act did not violate the

association members' First Amendment rights.

Since *Johanns*, the Sixth and Fourth Circuit Courts of Appeal have rejected calls to

limit the government speech doctrine when a government is advocating on an issue that is

before the voters or the legislature to decide.  In *Kidwell v. City of Union*, 462 F.3d 620, 626

(6th Cir. 2006), *cert. denied* 550 U.S. 935 (2007), the Sixth Circuit considered a First

Amendment challenge by taxpayers in a city in Ohio to the actions of its city and the city

manager.  The city council was using public funds to support a "Vote No" campaign on an

issue referred to the voters -- whether to overturn a city council resolution establishing a fire

---

[10] The associations objected to the policy promoting all beef products because it ran
contrary to their position that their specific beef products were superior because, among other
reasons, their cattle were grass-fed.

department for the city. The city charter expressly authorized expenditures by the city council to inform voters about election issues affecting the municipality, so long as the issues did not involve the election of particular candidates. The taxpayers filed suit, alleging that the city's use of public funds to advocate (not merely give information about) its position on a ballot issue amounted to compelled speech, in violation of their First and Fourteenth Amendment rights.

Noting that government speech in the context of an election presents "unique constitutional issues," the Sixth Circuit, in a split decision, held that First Amendment concerns did not justify a "bright-line rule barring such speech, at least where the government speaks within the scope of its governance functions." *Id.* at 625 (footnote omitted). It opined:

> Governments must serve their citizens in myriad ways, including by provision of emergency services, and these activities require funding through taxation. [The city council's] speech related to emergency service and tax initiatives thus fits squarely within its competence as governor and was made in the context of "advocat[ing] and defend[ing] its own policies." The issues on which the city advocated were thus germane to the mechanics of its function, and are clearly distinguishable from the hypothetical cases of government speech in support of particular candidates suggested by the dissent. . . . .
>
> In this case, Ohio's home rule system made [the city's] policies subject to acceptance or rejection by ballot. In this context, a limit on government speech during elections would allow hecklers to silence the government on issues in which it has an interest and expertise-and on which citizens have an interest in hearing their government's perspective. *See Ala. Libertarian Party v. City of Birmingham*, 694 F. Supp. 814, 817 (N.D. Ala.1988) (upholding promotional campaign relating to levies where the subject of the campaign was "related to the common needs of all citizens"). Because [the city's] speech in this case was germane to its role as governor, plaintiffs have failed to show

31

that democratic legitimacy is threatened or that [the city's] compelled subsidy of its speech violates the Constitution.

The natural outcome of government speech is that some constituents will be displeased by the stance their government has taken. Displeasure does not necessarily equal unconstitutional compulsion, however, and in most cases the electoral process-not First Amendment litigation-is the appropriate recourse for such displeasure. *See Johanns*, 544 U.S. at 563, 125 S.Ct. 2055 (noting the importance of political accountability of decisionmakers). The needs of effective governance command that the bar limiting government speech be high. The plaintiffs in this case have failed to show that the [city's] expenditures crossed the line separating a valid compelled subsidy from an unconstitutional one, and valid advocacy from prescription of orthodoxy.

*Id*. at 626 (some citations omitted).

In *Page v. Lexington County School District One*, 531 F.3d 275, 277 (4th Cir. 2008), the Fourth Circuit reached the same result in a case challenging a South Carolina school district's use of its website, email, and "other forms of communication" to oppose a bill pending before the state legislature that would grant tax credits to families who home-schooled their children or enrolled them in private school. The school district, which was a "body politic and corporate" under South Carolina law, took the position that the proposed law would undermine the public education system. *Id*. A citizen who supported the proposed law demanded equal access to the school district's "'informational distribution system'" to advocate in favor of the measure. *Id.* When the school district refused his request, he filed suit, alleging that the school district was engaging in unconstitutional viewpoint discrimination in violation of the First Amendment. The district court granted summary judgment in favor of the school district.

32

The Fourth Circuit affirmed. Citing *Johanns*, it opined that it is "well-understood" that "[e]ven though government is supported by the taxes of all, its policies are not supported by all. It follows therefore that the government may advocate in support of its policies with speech that is not supported by all." *Id*. at 280. The court emphasized that the government is "'accountable to the electorate'" for its speech. *Id*. at 281 (quoting *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 235 (2000)). As relevant here, the plaintiff citizen also argued that "as a general matter . . . the government speech doctrine should . . . never apply when the government attempts to influence legislation." *Id*. at 287. He maintained that advocacy of that type is unique because it is not "checked by the 'ballot box.'" *Id*. The Fourth Circuit disagreed. Citing *Kidwell*, it noted that the school board members were elected and were subject to removal in the next election "if the voters disagree[d] with the manner in which they have exercised their discretion." *Id*.

We return to the case at bar. The County used its website, email newsletter, Ride-On buses, public libraries and recreation centers, and vehicles to promote a message: voting to uphold Bill 18-11's limits on effects bargaining for MCPD officers is good County governance policy. The County communicated to potential voters its view that effects bargaining was detrimental to the County's efficient and productive management of its police force, and on that basis advocated in favor of Question B. As in *Kidwell*, the County's speech was directly related to its governance, was in an area in which it had expertise, and concerned

33

an issue about which the voters were entitled to hear its perspective in deciding how to vote. The County was engaged in government speech.

This is so even though Bill 18-11 had not gone into effect at the time the County engaged in the campaign. As noted, Bill 18-11 was passed during the 2011 County legislative session by unanimous vote and was signed into law by Leggett. A government may speak to advance its existing policies and programs, to advocate for policy changes, and to advocate against policy changes. *See Kidwell, supra; Page, supra*. As the *Page* Court emphasized, the check on government speech is that the individuals elected to office whose views the government is then espousing may be voted out of office. *See also Sutliffe v. Epping School District*, 584 F.3d 314, 331 n.9 (1st Cir. 2009) ("If the voters do not like those in governance or their government speech, they may vote them out of office"). Like the school board in *Page*, which was comprised of elected board members, the County was led by Leggett, an elected official. OPI is the mouthpiece of the County Executive's office and Lacefield is a political appointee. If County voters disagreed with the County's message on Question B or if they disagreed more generally with the County's choice to engage in a political campaign, they were free to vote out of office those they deemed responsible.

Finally, and very significantly, the FOP points out that the trial court found as a fact that the County's campaign was "partisan" and argues that this finding was entitled to deference. It suggests that "partisan" speech always falls outside the realm of government speech that may be supported with public funds. We disagree that this was a factual finding

34

subject to review for clear error. The underlying facts relative to the County's campaign activities were not in dispute. The characterization of those campaign activities as "partisan" involves the application of the law to those undisputed facts and therefore is subject to *de novo* review.

The term "partisan" ordinarily refers to activity "directed toward the success of a political party." *Bauers v. Cornett*, 865 F.2d 1517, 1524 (8th Cir. 1989) (interpreting the Hatch Act's restrictions on federal employees' engaging in partisan political activity on or off the job); *see also* EL § 1-101(ee) (defining "Partisan organization" to mean "a combination of two or more individuals formed *for the purpose of organizing a new political party*) (emphasis added); 5 C.F.R. 734.101 (defining partisan "when used as an adjective" to mean "related to a political party"). The County's campaign on Question B was not "directed toward the success of a political party," nor was it "related to a political party," except in the sense that Leggett is a Democrat. If the party affiliation of the head of a government is the touchstone, no matter how strongly related the speech is to governance and no matter how unrelated it is to party politics, then any speech on behalf of a government would be "partisan." That would be an absurdity.

The speech at issue here was directed toward passage of a ballot question on a nonpartisan issue: whether a change in the law to eliminate a particular form of collective bargaining for certain County-employed police officers should be upheld. The County's campaign focused on the negative impact that effects bargaining was having on the function

35

of the Chief of Police and the management of the MCPD. While the campaign was political, in that it concerned a question to be put to the voters, it was not partisan in any traditional sense of that word.[11] As the United States Supreme Court has observed: "Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue." *First Nat.l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978) (citations and footnote omitted). The campaign here was undertaken by the County to advance a change in the law on a non-partisan issue that would assist the County and its Chief of Police in best managing the police department. The County's speech in the campaign was political, but was permissible government speech.

**B.**

**Limitations on Government Speech**

Our holding that the County's advocacy on Question B was government speech does not compel the conclusion that it had the power to use public funds for government speech. The County still could be acting beyond its legislatively delegated powers or could be prohibited by state law from using public funds in a political campaign. *See Pleasant Grove*

---

[11]The trial court may have viewed Leggett's effort to encourage the two major political parties to advocate in favor of Question B as "partisan" activity. We disagree that this type of outreach, which is more properly characterized as bipartisan, would transform otherwise permissible government speech into improper partisan political speech.

*City*, 555 U.S. at 467-68 (government speech that does not violate the Free Speech Clause still "may be limited by law, regulation, or practice.").

We begin by considering whether the County's advocacy on Question B was within its powers as a charter county. The County adopted the charter form of local self-government in 1948. *McCarthy v. Bd. of Educ.*, 280 Md 634, 638 (1977). The right of local self-government is guaranteed to charter county residents by the Home Rule Amendment in Article XI-A of the Maryland Constitution, which was ratified in 1915. The Home Rule Amendment does not grant "absolute autonomy to local governments"; rather, it provides for the "transfer to the counties, within well-defined limits, of legislative powers formerly reserved to the General Assembly." *Ritchmount P'ship v. Bd. of Supervisors of Elections for Anne Arundel Cnty*, 283 Md. 48, 56 (1978). *See also River Walk*, 396 Md. at 543 (local governments are "limited to exercising only those [powers] expressly granted by the Legislature"). The transfer of powers was accomplished in 1918 by passage of the Express Powers Act, formerly codified at Md. Code (1957, 2011 Repl. Vol.), Article 25A, and now codified at Title 10 of the Local Government Article.

Beyond those powers expressly enumerated, a local government also may exercise powers "'necessarily or fairly implied in or incident to the powers expressly granted,' and those powers essential or indispensable to 'the accomplishment of the declared objects and purposes of the corporation.'" *River Walk*, 396 Md. at 543 (quoting *Hardy v. Housing Mgmt. Co.*, 293 Md. 394, 396-97 (1982)). Adoption of the Home Rule Amendment and passage of

the Express Powers Act were not intended to abrogate the powers traditionally held by local governments. *Schneider v. Lansdale*, 191 Md. 317 (1948). One such power "traditionally belonging to all counties" is "'the making of budgets and the appropriation of money for county expenses, debt, service, etc.'" *City of Annapolis v. Anne Arundel Cnty.*, 347 Md. 1, 13 (1997) (quoting *Schneider*, 191 Md. at 323). Thus, "any county, charter counties included, is authorized to appropriate money for its governmental purposes, *i.e.*, any purpose within the authority of the county to perform." *Tyma v. Montgomery Cnty.*, 369 Md. 497, 513 n.12 (2002).

The FOP does not dispute that as County Executive Leggett had the power to request that the County Council pass a budget bill appropriating money for OPI, and that the County Council had the power to do so. In fiscal year 2013, the County Council appropriated more than $1 million for OPI's budget. Because OPI is an executive department, its budget is controlled by Leggett. As the County Executive, Leggett authorized Lacefield to use up to $200,000 of the OPI budget for the County's Question B campaign.

The FOP maintains, however, that OPI's budget could not be used to fund the Question B campaign because the County does not have enumerated, inherent, or implied powers to use *any* public funds in a political campaign. We disagree. The County's authority to budget and appropriate money necessarily includes the authority to spend that money to advance a non-partisan governmental purpose. The County is the employer and the manager of the MCPD. Effects bargaining was, in the County's view, negatively

38

affecting its ability to efficiently manage the police force. Informing the public of its position on Question B and advocating for its passage were within the broad umbrella of "governmental" aims. The County did not need additional authority to use its funds in this manner. Thus, unless the County's use of these funds was otherwise prohibited by state or local law, its actions were not *ultra vires*.[12]

The FOP posits that by its State campaign finance laws, the General Assembly has implicitly prohibited local governments from expending public funds on election campaigns. As noted, it maintains that had the General Assembly contemplated that local governments would use public funds to campaign in contested elections, it would have regulated local government campaign finance activity in the Election Law, which is "a comprehensive plan for the conduct of elections in Maryland." *Cnty. Council v. Montgomery Ass'n*, 274 Md. 52, 64 (1975). The absence of such regulation means that local governments are without power to expend public funds on election campaigns.

We agree with the trial court and the parties that the County is not subject to the campaign finance laws in Title 13 of the Election Law Article, not for what that article says but for what it does not say.[13] As we shall explain in greater detail in Part IV of this opinion,

_____

[12]The County concedes that advocacy by the County on behalf of a particular candidate would not advance a governmental purpose and therefore would be *ultra vires*.

[13]In its opinion, the trial court stated that none of the parties were arguing that the County was bound by the Title 13 of the Election Law Article, which governs campaign finance activity. And the court made a specific finding as such. In its cross-appeal, the FOP does not challenge the entry of judgment in favor of the County on Count 5 of the amended
(continued...)

39

the campaign finance laws in Title 13 require that campaign finance activity, including such activity regarding a ballot issue, be conducted through a duly registered political committee, which in the case of a ballot issue is called a ballot issue committee. Political committees must file campaign finance reports with the State Board, detailing contributions received, whether in funds or in kind, expenditures made, and obligations incurred.

The language of the campaign finance laws does not exclude a local government from the ambit of those laws, expressly or impliedly.  It is a well established rule of statutory construction that we will presume that the legislature's enactments regulate private conduct -- not government conduct -- unless the legislature manifests an intention to the contrary. *See, e.g., Unnamed Physician v. Comm'n on Med. Discipline of Md.*, 285 Md. 1, 12 (1979) ("This  Court has consistently held that the word "person" in a statute does not include the State, its agencies or subdivisions unless an intention to include these entities is made manifest by the legislature.") (emphasis added).  *See also Washington Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 622-23 (2010) (same).  Because the language of the campaign finance laws, in Title 13 of the Election Law Article, does not manifest an intention by the General Assembly to regulate campaign finance activity of local governments, including counties, we presume no such regulation; and we see nothing to

---

[13](...continued)
complaint, which was the only count alleging that the County directly violated the EL Article.

counteract that presumption. Accordingly, Title 13 of the Election Law Article does not apply to campaign finance activity by the County.

We find no merit in the FOP's argument that because the campaign finance laws in the Election Law Article do not govern local government financial activity on a political campaign, including a campaign on a non-partisan ballot issue, the General Assembly must have intended that local governments will not use public funds for political campaigns of any sort. "Interpretation of Maryland statutes rests upon the proposition that the General Assembly says what it means and means what it says." *Sacchet v. Blan*, 120 Md. App. 154, 156 (1998). If the General Assembly intended to prohibit local governments from using public funds for a political campaign, it would say so. Indeed, some states have enacted statutes expressly prohibiting expenditures by state and local government entities to advocate for or against ballot measures. *See* Ariz. Rev. Stat. Ann. § 9-500.14 (prohibiting expenditure of money by city or town to influence the outcome of any election, but permitting neutral informational pamphlets on bond issues); Colo. Rev. Stat. § 1-45-117 (prohibiting the expenditure of public funds to advocate for the success or defeat of ballot measures, but permitting factual summaries prepared on such measures).

The General Assembly has not enacted any such legislation, and one cannot reasonably infer from the fact that campaign expenditures by local governments are not governed by the Election Law Article that the General Assembly intended to prohibit any campaign activity by local governments. Moreover, it is questionable whether statutory

41

regulation of a local government's use of its own funds to advocate on a non-partisan ballot issue would serve the goals of transparency and limits on contributions that campaign finance regulations are designed to advance. When a local government uses its funds to advocate on a ballot question, the source of the funds and the identity of the speaker are clear. As the *amici* point out in their brief, a local government is subject to the Public Information Act, Md. Code (2014), Title 4 of the General Provisions Article, and any citizen may file a PIA request seeking disclosures related to government advocacy. Also, unlike contributions to a candidate's or slate's political committee, which are limited, there are no limits for contributions to ballot issue committees. *See* EL § 13-226(a).

We hold that the County had the inherent power to use properly appropriated funds for a governmental purpose, and that advocacy on a non-partisan ballot measure pertaining to the management of the County's police force plainly was a governmental purpose. If the General Assembly (or the County) wishes to restrict or regulate local government spending in an election, it may do so, but the State campaign finance laws do not restrict the County's use of its budget in this way. For all of these reasons, the trial court erred in granting judgment in favor of the FOP on Count 4 of the amended complaint.

**IV.**

*Leggett and Lacefield: Violation of Campaign Finance Laws*

42

The Election Law Article governs all aspects of State and county elections in Maryland.[14],[15] Title 13 regulates "Campaign Finance," and "applies to each election conducted in accordance with" the EL Article. EL § 13-101(a).[16] Subtitle 2 concerns "Campaign Finance Organization and Activity." Unless otherwise provided by law, it applies to "all campaign finance activity associated with an election under this article." EL § 13-201.

"[A]ll campaign finance activity for an election" must be "conducted through a campaign finance entity[,]" unless expressly authorized by another law. EL § 13-202(a). Ordinarily, a "campaign finance entity" is a "political committee" established EL section 13-207. EL § 1-101(h). A political committee is a "combination of two or more individuals that assists or attempts to assist in promoting the success or defeat of a candidate, political party, or question submitted to a vote at any election." EL § 1-101(gg) (emphasis added). As noted, a political committee that is "formed to promote the success or defeat of a question to be submitted to a vote at an election" is a "ballot issue committee." EL § 1-101(f). Thus, a ballot issue committee is a type of political committee.

A political committee is created by filing with the State Board a form affidavit signed by the political committee's chairman and treasurer. Once created, the political committee

---

[14] All references are to the Md. Code (2003, 2010 Repl. Vol., 2012 Supp.) version of the Election Article.

[15] It does not apply to municipal elections, however, unless specifically stated. *See* EL § 1-101(v) (defining the term "election").

[16] There is an exception for campaign finance activity that must be governed solely by federal law. EL § 13-101(b).

43

must file a "Statement of Purpose" which, in the case of a "ballot issue committee," shall identify the relevant ballot question or questions. EL § 13-208(c).

"All assets received by or on behalf of" a political committee shall be delivered to the treasurer and maintained by him for the purposes of the committee. EL § 13-218(a). Assets of a political committee only may be disbursed if they have passed through the hands of the treasurer and in accordance with the purposes of the committee. EL § 13-218(a) and (b). The treasurer "shall keep a detailed and accurate account book of all assets received and expenditures made, and obligations incurred by or on behalf of" the political committee. EL § 13-221(a)(1). Limits are set on the amount of contributions that may be made to political committees supporting a candidate for office. As discussed above, ballot issue committees are excluded from those limits. EL § 13-226(a).

Subtitle 3 of Title 13 governs "General Reporting Requirements" for political committees. A ballot issue committee must file a campaign finance report on or before the fourth and second Fridays immediately preceding the general election and on or before the third Tuesday after the general election. EL § 13-309(a). The report must include all the information required by the State Board regarding contributions received and expenditures made on or on behalf of the campaign finance entity during the relevant reporting period. EL § 13-304(b). The failure to file timely and proper campaign finance reports may subject a campaign finance entity and its members to sanctions, including late fees; disqualification from becoming a candidate for office or from becoming the treasurer of another campaign

44

finance entity; disqualification from taking office as a duly elected public or party officer; and forfeiture of salary if the individual is a public officer, and referral for criminal prosecution. EL §§ 13-331 - 13-337.

Subtitle 6 creates additional penalties and sanctions for violations of Title 13 generally, including by making it a misdemeanor to knowingly and willfully violate any provision of Title 13, subject to a fine of up to $25,000 or a sentence of up to one year in prison.

Leggett and Lacefield contend the trial court erred in declaring that they were a "political committee" under EL section 13-207; that they therefore were required to adhere to the campaign finance and reporting provisions in Title 13 of the EL Article; and that they failed to do so, violating those provisions. They maintain that this ruling is inconsistent with the court's ruling that Title 13 of the EL Article does not regulate the County.

The FOP responds that because Leggett and Lacefield were working to "promot[e] the success . . . of a . . . question submitted to a vote at any election," EL § 1-101(gg), they were a "political committee" under the EL Article and were required to comply with Title 13's regulation of campaign finance and reporting. It maintains that, by their own admission, Leggett and Lacefield did not register a campaign finance entity with the State Board as required by Subtitle 2 or comply with any of the reporting requirements of Subtitle 3.

For the reasons already discussed, the campaign finance laws in Title 13 of the Election Law Article do not regulate a local government's use of public funds to advocate

on a ballot issue. The County's advocacy on Question B was government speech. A county only may speak through its officials and employees. The FOP alleged and the trial court found as a fact that Leggett and Lacefield were at all times relevant to this case acting on behalf of the County. They were not advancing their own personal political views; rather, they were speaking for the County as a government on an issue germane to governance.

Neither the County, Leggett, nor Lacefield was required to create a political committee to use County funds to advocate in favor of passage of Question B. And Leggett and Lacefield did not become a "political committee" under Title 13 (which did not apply to the County or to them) by using County funds to support a County campaign for Question B. Accordingly, they were not required to register with the State Board, file campaign finance reports, or otherwise comply with Title 13.

**V.**

*The County, Leggett, and Lacefield: Violation of State and Local Laws Regarding*
*Political Activity During Work Hours*

The County, Leggett, and Lacefield contend the trial court in ruling that by having County employees work on the Question B campaign during work hours, they violated state and local laws regarding County employees engaging in "political activity" during work hours. They assert that the laws in question are intended to prohibit public employees from engaging in personal political activity or being made to campaign on behalf of particular candidates during work hours, and have no bearing on political activity germane to governance that is part of a public employee's work responsibilities.

46

The FOP counters that the State and local laws cannot be read so narrowly. It maintains that any activity by a public employee during work hours that is part of an effort to affect the outcome of an election is "political activity" and therefore is not permitted by law.

We begin with the State laws. At all relevant times, Title 13 of Article 24, now recodified without substantive change in Title 1, Subtitle 3 of the Local Government Article, regulated the "political activities" of employees of local entities, which include a county. Art. 24, § 13-101. Section 13-103 protects the rights of employees to engage freely in political activities and not to be "required to provide any political service." Section 13-105 limits those rights, however, by providing that "[a]n employee of a local entity may not [e]ngage in political activity while on the job during working hours."

The County maintains that section 13-105 cannot be read to prohibit it from directing its employees to engage in government speech on a ballot issue that is germane to governance. We agree. Section 13-105 is a limitation on the rights secured to local government employees by section 13-103 to "freely participate in any political activity" and to be protected from being required to advance the personal political views (or candidacy) of their supervisors. *See Leopold v. State*, 216 Md. App. 586, 605-606 (2014) (upholding Anne Arundel County Executive's criminal conviction for misconduct in office when he required police officers assigned to protect him to engage in political service and political activity on his behalf during working hours).

47

As discussed, nonpartisan advocacy in favor of government programs and policies that are germane to the function of the government entity is a governmental role and is part of the job responsibilities of many government employees. For example, the County's Office of Intergovernmental Relations, which is in the executive branch, is solely responsible for responding to proposed state legislative and state executive proposals and policies that might affect the County. *See* Code § 2-64J. Thus, the County regularly takes positions on proposed changes to state law and its employees advance those positions as part of their ordinary job responsibilities. Activities by government employees that advance governmental policies by advocating for or against state and local laws are not prohibited "political activity," nor are they forced "political service."

The Charter grants similar rights and imposes similar restrictions with respect to "political activity" by County employees. Section 405 states that, with one exception not relevant here, a County employee may not be "prohibited from participating in politics or political campaigns" and may not be "obligated to contribute to a political campaign or to render political service." Section 406 prohibits the County Council, the County Executive, and any other County officer or employee from "caus[ing] any officer or employee of the County to do or perform any service or work outside of the officer's or employee's public office or employment." Section 408 requires County employees to "devote their entire time during their official working hours to the performance of their official duties." All three of these provisions are aimed at ensuring that County employees do not use County resources

for personal political activity and/or are not coerced into campaigning for a political candidate during work hours. They cannot be read to prohibit an employee from engaging in government speech on behalf of the County.

Section 19A-14 of the Code, which concerns misuse of the prestige of office, harassment, and improper influence, prohibits a public employee from "intimidat[ing], threaten[ing], coerc[ing] or discriminat[ing] against any person for the purpose of interfering with that person's freedom to engage in political activity." Code § 19A-14(e). Section 3-8 of the MCPR regulates the political activities of County employees. It grants County employees the right to "participate in political causes and campaigns on [their] own time," but prohibits them from using "County equipment, supplies, or other property for a political cause or campaign." MCPR § 3-8 (a) & (b). It prohibits a County employee from directing another County employee to "perform work or provide services of any type to a political cause or campaign." MCPR § 3-8(d). County employees also may not wear a County uniform while engaging in political activity, or put a bumper sticker, banner, or sign on County property unless directed to do so by a supervisor or otherwise authorized by their department. MCPR § 3-8(e) & (g). For the reasons already discussed with respect to the parallel State law and Charter provisions, neither the Code nor the MCPR prohibited the conduct in this case.

**VI.**

*EL Section 12-202(a)*

49

For the reasons explained above, Leggett and Lacefield were not bound by Title 13 of the EL Article. Accordingly, we need not address their argument that the FOP failed to satisfy the prerequisites of EL section 12-202(a) before bringing suit for violation of that article.

**CROSS-APPEAL**

In its cross-appeal, the FOP contends the trial court erred by not awarding it monetary damages for being deprived of its rights to a free election and due process of law, as secured by Articles 7 and 24 of the Maryland Declaration of Rights; by not awarding it attorneys' fees; and by not ordering Leggett and Lacefield to repay the County funds that were expended on the Question B campaign. We have held in the appeal that the County had the power to use its properly appropriated funds to advocate for the passage of Question B and that its campaign was lawful; that Leggett and Lacefield, acting on behalf of the County, were authorized to spend those County funds for that purpose and to direct County employees to assist in the campaign; and that they did not violate any State or local laws in doing so. These holdings negate the trial court's findings of constitutional violations and further negate the premises on which the cross-appeal is based.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. COSTS TO BE PAID BY THE APPELLEES.**