HEADNOTE: FOP v. MONTGOMERY COUNTY (S.T. 2015, No. 45)

IN AN ACTION BY A POLICE UNION CHALLENGING THE AUTHORITY OF A CHARTER COUNTY TO USE ITS FISCAL AND HUMAN RESOURCES TO URGE APPROVAL OF A LAW ENACTED BY THE COUNTY COUNCIL THAT LIMITED BARGAINING RIGHTS AND THAT HAD BEEN PETITIONED TO REFERENDUM, THE COURT OF APPEALS HELD:

(1) THE COUNTY HAD SUCH AUTHORITY UNDER BOTH STATE AND LOCAL LAW AND THE "GOVERNMENT SPEECH" DOCTRINE;
(2) THE COUNTY EXECUTIVE AND DIRECTOR OF THE OFFICE OF PUBLIC INFORMATION HAD AUTHORITY TO ACT FOR THE COUNTY IN EXERCISING THAT AUTHORITY;
(3) FOP WAS NOT BARRED FROM FILING ITS ACTION BY LACK OF STANDING OR LACHES.

IN THE COURT OF APPEALS

OF MARYLAND

No. 45

September Term, 2015

_____

FRATERNAL ORDER OF POLICE, *et al.*

vs.

MONTGOMERY COUNTY,
MARYLAND, *et al.*

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Raker, Irma S. (Retired, Specially
Assigned)
Wilner, Alan M. (Retired, Specially
Assigned)


JJ.

_____

Opinion by Wilner, J.

_____

Filed: February 23, 2016

There are several issues presented in this appeal. The principal one is whether a charter county – Montgomery County in this instance -- is authorized to use its human and fiscal resources to encourage the electorate of the county to support, or oppose, a ballot measure that may have a significant impact on the operations of the county government. The Circuit Court for Montgomery County said "no," the Court of Special Appeals said "yes," and we also shall say "yes."

BACKGROUND

**The Battle Over Effect Bargaining**

Sections 33-75 through 33-85 of the Montgomery County Code provide for collective bargaining between the county and the certified representative of county police officers below the rank of lieutenant which, in this case, is petitioner, Lodge 35 of the Fraternal Order of Police (FOP). The provisions most relevant to this appeal are §§33-80 and 33-81.

Section 33-80(a) lists the matters that are subject to mandatory collective bargaining. Section 33-80(b) lists certain rights and responsibilities of the county that are **not** subject to mandatory collective bargaining but, under subsection (c), may, in the county's discretion, be discussed with the union. They include such things as determining the overall budget and mission of the police department; maintaining and improving the efficiency and effectiveness of the department; determining the overall

organizational structure, methods, processes, means, job classifications, or personnel by which operations are to be conducted; directing and supervising employees; hiring, selecting, and establishing standards governing promotion of employees; transferring, assigning, and scheduling employees; and taking actions to carry out the mission of government in situations of emergency.

The items listed in §33-80(a), for the most part, are those common in collective bargaining laws – salary and wages; pension, retirement, and other benefits; hours and working conditions; a grievance procedure; and matters relating to the health and safety of employees. Prior to 2011, there was an additional matter (§33-80(a)(7)) that also was subject to mandatory bargaining – "the effect on employees of the employer's exercise of rights listed in subsection (b)." That provision, insofar as Montgomery County was concerned, was unique to collective bargaining with the police union. It was not part of the county collective bargaining law pertaining to firefighters or county employees generally. Indeed, an attempt to add it to that law in 1986 was rejected by the County Council.[1]

Subjection of the "effect" of the county's exercise of rights reserved to it under §33-80(b) to mandatory bargaining had particular significance because of §33-81(c)(2),

---

[1] Although FOP asserts that "effect bargaining" is common in collective bargaining laws, evidence produced at the hearing on the bill that ultimately amended §33-80(a)(7) in 2011 revealed that "effect bargaining" was not part of the collective bargaining law for employees in Baltimore City, Anne Arundel, Baltimore, Frederick, Harford, Howard, or Prince George's County, for most State Executive Branch employees, or for public school employees.

which dealt with the procedure for resolving impasses in bargaining over such "effects." The procedure was a form of final offer arbitration. Under that section, if the county notified FOP that it "intends to exercise a right listed in Section 33-80(b), the exercise of which will have an effect on members of the bargaining unit," the parties were required to choose an impasse neutral, and, unless they were otherwise able to resolve the dispute, each was required to submit a final offer to the neutral. The neutral was then empowered to select what he or she believed was the more reasonable offer and, if appropriate, to provide retroactive relief.

Section 33-80(a)(7) was part of the original collective bargaining law for police officers enacted in 1982. The legislative history of that law indicates that the intent of the provision was not to subject the "decision to exercise a management right" to bargaining, but only the method of implementing that decision. The county personnel director at the time stated, by way of example, that a decision to lay off employees would not be subject to bargaining, but the decision as to whom to lay off first would be. At least one councilmember disagreed with that interpretation, but an attempt to delete the provision failed.

On January 31, 2011, the Montgomery County Organizational Reform Commission, created in 2010 by County Council Resolution to recommend changes that would increase the efficiency of county operations, filed its Final Report which, in Recommendation 21, urged that §33-80(a)(7) be amended to make it consistent with the scope of bargaining for firefighters and other county employees. The Commission

3

noted that, in practice, effect bargaining "has become the exception that makes most management decisions subject to bargaining" and "has hampered the ability of the Police Department to issue directives to govern how police officers must operate." It added that "FOP has recently delayed the implementation of all directives by refusing to respond to them."[2]

Responding to the Commission's recommendation, the County Council President introduced Bill No. 18-11 in June 2011 to amend §33-80(a)(7) by limiting effect bargaining to the "amelioration" of the effect on employees when the county's exercise of rights under §33-80(b) "causes a loss of jobs in the [bargaining] unit." The bill also deleted the special impasse procedure under §33-81(c) with respect to effect bargaining.

At the County Council hearing on the bill, the county Police Chief listed the kinds of administrative directives that were subject to effect bargaining. He estimated that bargaining over a minor issue normally required between two weeks and 90 days, without impasse arbitration, that impasse arbitration added an additional two to three months, and that a "significant" matter could take up to two years to resolve. He noted that the county's attempt to create a mandatory electronic reporting system was delayed by three years of bargaining and that he still was required to send all communications to officers in paper form because they had refused to establish county e-mail accounts.

---

[2] An attempt was made by the County Executive in 2000 to have the County Council amend §33-80(a)(7) but, in the face of FOP opposition, the attempt failed.

The bill was passed by the County Council in July 2011 and was signed by the County Executive on August 1. Pursuant to §112 of the Montgomery County Charter, the law took effect October 31, 2011 – 91 days after it was signed. FOP promptly commenced an effort to refer the law to referendum pursuant to §114 of the County Charter and Art. 11-F, §7 of the Maryland Constitution. That drive ultimately proved successful. Petitioners were able to collect more than the required number of signatures (five percent of the qualified voters in the county), whereupon the county challenged the validity of several thousand of those signatures. That challenge was not resolved until August 12, 2012, when this Court concluded that the signatures were valid. *See FOP Lodge 35 v. Montgomery Co.*, 427 Md. 522, 50 A.3d 8 (2012) (*per curiam* Order explained later in 436 Md. 1, 80 A.3d 686 (2013)).

Upon the filing of our *per curiam* Order, Bill No. 18-11 was slated to appear on the ballot at the November 6, 2012 general election as Question B, whether the bill should become law. A "yes" answer would sustain the law; a "no" vote would nullify it. In accordance with §115 of the County Charter, the effect of the law which, as noted, had taken effect the previous October, was stayed pending the result of the referendum.[3] Both sides commenced their respective campaigns to capture the hearts and minds of the county voters.

---

[3] With exceptions not relevant here, §115 provides that, when a referendum petition that contains the required signatures has been filed, the legislation to be referred shall not take effect until 30 days after its approval by a majority of the registered voters voting thereon.

The County Executive, Isiah Leggett, believing that the requirement of effect bargaining had significantly hampered the ability of the Police Chief to efficiently manage the operation of the County Police Department, directed an effort by the County government to encourage county voters to vote "yes" on Question B. The effort was managed in large part by Patrick Lacefield, Director of the County Office of Public Information. Leggett authorized Lacefield to spend up to $200,000 from the funds appropriated by the County Council to his office in furtherance of the effort.

Lacefield ultimately spent $122,350, which went for such things as putting ads in buses, displaying posters in county libraries and bumper stickers on county cars, purchasing ads in the local media, producing and distributing flyers and lawn signs, posting a "Vote for Question B" on the county website, including advocacy materials in its electronic newsletter distributed to about 125,000 county residents, mass mailings to more than 163,000 households in the county, employing political and media consultants, and hiring individuals to distribute campaign literature. Leggett enlisted the support of both the Democratic and Republican Central Committees. The central message of the county was that FOP had been holding up a variety of policies necessary to the efficient operation of the Police Department, which raised the question of who should be running the Department – the Police Chief or the union leaders?

FOP, which contemporaneously was running a vigorous campaign to defeat the new law, objected to the county's advocacy and, in particular, to the use of county funds and personnel in furtherance of it. FOP complained to the American Civil Liberties

6

Union, the County Inspector General, the State Prosecutor, and the United States Attorney for the District of Maryland, and when it received no relief from them, petitioners (FOP and two of its members, individually), filed this lawsuit on November 5, 2012 -- one day before the election. The next day, the voters approved Question B, 58 percent voting "yes" and 42 percent voting "no."

**The Complaint**

The complaint was brought both individually and as a class action -- the class being Montgomery County police officers below the rank of lieutenant – against the county, Leggett, and Lacefield. As amended, it contained ten counts. Counts 1 through 6 sought declaratory and injunctive relief as follows:

Count 1, against Leggett and Lacefield, sought a declaratory judgment that their conduct violated the campaign finance organization and activity requirements of Title 13, Subtitle 2 and the reporting requirements of Subtitle 3 of the State Election Law Article (EL) and a directive that they comply with those requirements.

Count 2, also against Leggett and Lacefield, sought a declaratory judgment that their conduct violated Article 24, §13-105 of the Maryland Code (since revised as §1-304 of the Local Government Article (LG)).[4]

---

[4] Article 24, §13-105 (current LG §1-304) prohibits an employee of a governmental entity from engaging in political activity while on the job during working hours.

Count 3, against Leggett and Lacefield, sought a declaratory judgment that their conduct violated §§405, 406, and 408 of the Montgomery County Charter, §19-A-14 of the County Code, and Montgomery County Personnel Regulation 3-8.[5]

Count 4, against the county, sought a declaratory judgment that the county had no power or authority to engage in electioneering and campaigning activities to promote the approval of Question B and that its actions were *ultra vires* and unlawful.

Count 5, also against the county, sought a declaratory judgment that the electioneering and campaigning activities of the county in promoting the approval of Question B were in violation of Maryland law, including EL Title 13 and Art. 24 §13-105 (LG §1-304).

Count 6, against the county, sought a declaratory judgment that the county's electioneering and campaigning activities were in violation of §§405, 406, and 408 of the County Charter, §19-A-14 of the County Code, and County Personnel Regulation 3-8.

---

[5] In relevant part, §405 of the County Charter provides that no county officer or employee shall be obligated to contribute to a political campaign or to render political service. Section 406 prohibits officers or employees of the county from detailing or causing any other officer or employee to do or perform any service or work outside the officer's or employee's public office or employment. Section 408 requires officers and employees paid in whole or in part from county funds to devote their entire time during their official working hours to the performance of their official duties. Section 19A-14 of the County Code contains a number of restrictions on using the prestige of a public employee's office for private gain or using county property or work time for personal use. County Personal Regulation 3-8 contains restrictions on political activity by county employees, including the use of county property for a political cause or campaign.

In addition to the declaratory relief, each of the first six counts also sought costs and other unspecified general relief.

Counts 7 through 10 also sought declaratory relief but money damages as well, as follows:

Count 7 charged that Leggett's use of county resources to promote the approval of Question B violated Article 6 of the Md. Declaration of Rights and constituted misconduct in office.[6]  It sought a "determination" to that effect and an order that he reimburse the county for the cost of all of the electioneering and campaign activity undertaken by the county, plus reasonable attorneys' fees.  Count 8 sought the same relief against Lacefield.

Count 9 purported to be a taxpayer cause of action seeking a declaratory judgment that Leggett's and Lacefield's activities in support of Question B constituted an impermissible use of public funds and demanded an accounting by them and reimbursement to the county.

---

[6] Art. 6 of the Declaration of Rights states that all persons invested with Legislative or Executive powers of government are trustees of the public and are accountable for their conduct.

Count 10, against the county, Leggett, and Lacefield, alleged that their activities violated "the State Constitutional rights" of FOP and its members and sought a declaration to that effect plus damages and reasonable attorneys' fees.[7]

The county contested the merits of the complaint and argued, in addition, that petitioners had no standing to bring the action, that the claims were barred by laches, and that, because FOP had participated in a campaign in connection with a 2010 ballot question, FOP was proceeding with unclean hands.

**The Judgment**

After a 10-day bench trial, the Circuit Court, on March 21, 2014, entered a memorandum and order, followed a week later by a series of declaratory judgments. The court rejected the defenses of lack of standing, laches, and unclean hands. The heart of its decision were declarations by the Court that the county, Leggett, and Lacefield had no authority to do what they did and that their conduct violated the State and local laws, as alleged by petitioners. In that regard, it declared inapplicable the doctrine of "government speech," which the county asserted permitted governmental entities to promote or oppose legislative measures, including ballot questions, that may affect its operations. With respect to Counts 7 through 10, however, which sought monetary relief,

---

[7] The first amended complaint alleged more specifically the violation of Articles 6, 7, 10, 19, and 24 of the Declaration of Rights and Section 7 of the Constitution of Maryland. That was replaced later with the blanket allegation. There is no section 7 of the Maryland Constitution.

the court found that Leggett and Lacefield had qualified immunity, and it dismissed those counts. More specifically, the court entered declaratory judgments that:

As to Count 1, Leggett and Lacefield constituted a "political committee" under EL Title 13, that they were required to comply with the organization and activity requirements of Subtitle 2 and the reporting requirements of subtitle 3 of that Title, and that they failed to do so.

As to Count 2, the activities of Leggett and Lacefield caused county employees to engage in the "partisan political campaign" to support Question B in violation of Art. 24, §13-105.

As to Count 3, those activities of Leggett and Lacefield also violated §405, 406, and 408 of the County Charter, §19A-14(a), (c), (e), and (f) of the County Code, and County Personnel Regulation 3-8(b) and (d).

As to Count 4, the county had no legal authority under Art. XI-A of the Maryland Constitution, or Art. 25A, §5 of the Maryland Code (now part of LG Title 10) to engage in electioneering and the "partisan political campaign" to advocate voter approval of Question B.

As to Count 5, the county was not subject to the Election Law Article.

As to Count 6, the electioneering and "partisan political campaign" activities of the county in advocating voter approval of Question B violated §§405, 406, and 408 of

11

the County Charter, §19A-14(a), (c), (e), and (f) of the County Code, and County Personnel Regulation 3-8(b) and (d).

In its March 21 Memorandum and Order, the court concluded that, because the conduct of Leggett and Lacefield, even if illegal, was discretionary in nature and did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known," they enjoyed qualified immunity from monetary damages. For that reason, the court dismissed Counts 7 through 10.

**The Appeal**

Neither side was happy with the Circuit Court judgments, and so there were cross appeals. The respondents objected to the declaratory judgments denying the county's authority to advocate for or against ballot issues that may have an impact on the operation of the county government and finding that Leggett and Lacefield violated the various laws in implementing the county's efforts to have the law sustained. They also renewed their defenses of lack of standing and laches. Petitioners were unhappy with the court's finding of immunity on the part of Leggett and Lacefield. FOP was seeking reimbursement for the money it claimed it was required to spend in response to the county's campaign.

The Court of Special Appeals reversed the Circuit Court judgments. *Montgomery Co. v. Fraternal Order of Police*, 222 Md. App. 278, 112 A.3d 1052 (2015). It affirmed,

however, the Circuit Court's rejection of the county's standing and laches defenses. The Court held that, as the certified representative of police officers under the rank of lieutenant, FOP had a fiduciary duty to its members to advocate against Question B, the passage of which would diminish their bargaining rights. That gave it a special interest in challenging the county's use of public funds and employees to work for approval of that question, different in character and kind from that possessed by the general public.

As to laches, the appellate court observed that petitioners were not seeking to overturn the election result, that FOP had pursued several non-judicial remedies before resorting to litigation, and that the declaratory and monetary relief sought was susceptible to post-election adjudication without prejudice to the county. It concluded that the trial court did not abuse its discretion in finding that there was no unreasonable delay or any prejudice from the filing of the action on November 5, 2012.

The major disagreement between the Circuit Court and the Court of Special Appeals, with respect to the county, centered on the contours of the government speech doctrine. The Circuit Court found that the doctrine does no more than exempt government speech from First Amendment scrutiny and does not constitute an affirmative authority for government to advocate and spend money on political campaigns.

The Court of Special Appeals had a broader view of the doctrine. Relying on a number of Federal appellate decisions that applied language from *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 125 S. Ct. 2055, 161 L.Ed.2d 896 (2005), the Court of Special

Appeals concluded that the county's speech was directly related to its governance, was in an area in which it had expertise, and concerned an issue about which the voters were entitled to hear its perspective in deciding how to vote, and therefore constituted government speech. Its ultimate conclusion was that the county "had inherent power to use properly appropriated funds for a governmental purpose, and that advocacy on a non-partisan ballot measure pertaining to the County's police force plainly was a governmental purpose." *Montgomery County, supra,* 222 Md. App. at 315, 112 A.3d at 1094.

The appellate court disagreed as well with the trial court's conclusions regarding Leggett's and Lacefield's activity. It concluded that Leggett and Lacefield did not constitute a political committee and were not required to comply with the requirements of EL Title 13, subtitles 2 or 3, that they did not violate Art. 24, §13-105, §§405, 406, or 408 of the County Charter, §19A-14 of the County Code, or County Personnel Regulation 3-8. In light of those holdings, it found the cross-appeal moot. As there were no violations, there was no need to consider immunity.

Because of the important issues presented, we granted the petitioners' petition for *certiorari* and, as well, respondents' conditional cross-petition seeking review of the rejection of their standing and laches defenses.

### DISCUSSION

14

**Standing and Laches**

This Court discussed the doctrine and requirement of standing most recently in

*Kendall v. Howard Co.*, 431 Md. 590, 66 A.3d 684 (2013) and *State Center v. Lexington*

*Charles*, 438 Md. 451, 92 A.3d 400 (2014).  We pointed out in *Kendall* that the

requirement of standing "is an element in the larger question of justiciability and is

designed to ensure that a party seeking relief has a sufficiently cognizable stake in the

outcome so as to present a court with a dispute that is capable of judicial resolution."  431

Md. at 603, 66 A.3d at 691 (quoting from *Hand v. Mfrs. & Traders Trust Co.*, 405 Md.

375, 399, 952 A,2d 240, 254 (2008).  We added in *Kendall* that, under Maryland

common law, "standing to bring a judicial action generally depends on whether one is

'aggrieved,' which means whether a plaintiff has 'an interest such that [he, she, or it] is

personally and specifically affected in a way different from . . . the public generally.'"

*Id*. at 603, 66 A.3d at 691.

In a nutshell, a person – individual or organization – has no standing to bring an

action in court unless the person has suffered some kind of special damage from the

alleged wrong differing in character and kind from that suffered by the general public.

*Kendall* was a case where there was no such special damage.  The plaintiffs were seeking

to have the court annul a number of county land use decisions, in the form of legislative

resolutions and ordinances, and administrative decisions that they claimed were

unauthorized by, and indeed were in violation of, the county charter.  They showed no

special harm, however, to their property or to themselves as taxpayers, but merely "an

15

abstract, generalized interest in the County's compliance with [its Charter], which is shared by all members of the general public in [the county]," and that was not enough to provide standing. *Id.* at 615, 66 A.3d at 698.

That is not the case here. Although all citizens living in Montgomery County have a general interest in assuring that the county government does not exceed its legitimate authority and does not expend funds or the labor of its employees for unlawful purposes, petitioners had a more specialized interest in sustaining effect bargaining and assuring that the county did not use unlawful means to repeal that provision.

FOP had a statutory duty under §33-78(c) of the County Code to represent fairly and without discrimination all police officers in the bargaining unit. Part of that duty, and, under §33-80(a)(7), was to bargain collectively on the effect of the county's exercise of any of its otherwise exclusive rights under §33-80(b). As the legislative history of that provision indicates, it greatly expanded the scope of mandatory bargaining in favor of the police officers in the bargaining unit and thus directly affected, in a positive way for them, the conditions of their employment. Both the police officers and FOP, as their exclusive bargaining agent, having successfully petitioned the repeal to referendum, had a clear special interest in protecting that right. In such a political battle, that special interest extended to requiring its formidable opponent to act lawfully.

In that regard, our decisions in *Teachers Union v. Board of Education*, 379 Md. 192, 840 A.2d 728 (2004) and *Patterson Park v. Teachers Union*, 399 Md. 174, 923 A.2d 60 (2007) are particularly relevant. In *Teachers Union*, the teachers union, being the

16

exclusive bargaining representative for public school teachers in Baltimore City, filed suit to prevent the State Board of Education from turning control over three public schools in the City to a private company, including the power to hire, assign, discipline, and dismiss teachers in those schools and thereby remove those employees from the scope of the labor agreement that the union had with the City school board.

The State Board moved to dismiss the complaint on the ground that the union had no special interest in the Board's action and therefore no standing to bring the lawsuit. We disagreed, noting that the effect of the turnover was to shrink the size of the bargaining unit and thereby diminish the negotiating power of the union *vis a vis* the City school board. We followed that approach as well in *Patterson Park*. The Circuit Court and the Court of Special Appeals were correct in holding that the petitioners had standing to pursue this lawsuit.

In arguing laches, respondents note that petitioners certainly were aware of the county's efforts to sustain the law on referendum by September 20, 2012, when FOP complained to the County Inspector General about what Leggett and Lacefield were doing, yet they did not file suit until November 5 – a month-and-a-half later and only a day before the election – and did not succeed in serving respondents until December 31. They rely on *Ross v. Board of Elections*, 387 Md. 649, 876 A.2d 692 (2005).

Except for the general discussion of laches in our Opinion, *Ross* is wholly distinguishable and of no assistance to the petitioners. Glenn Ross was an unsuccessful candidate for a seat on the Baltimore City Council. Eleven days before the election,

17

running as the Green Party candidate, he asked the State Board of Elections to disqualify the Democratic Party nominee, Paula Branch, on the ground that, because of the failure of her campaign to timely file campaign finance reports, she was not qualified to be on the ballot. The Board, without opining whether that failure constituted a ground for disqualification, declined to remove Branch from the ballot, and she proceeded to defeat Ross soundly, garnering 80 percent of the vote. Three days after the election, Ross filed suit to enjoin the City Board of Canvassers from certifying Branch as the winner.

Cross motions for summary judgment were filed. Ross's was denied, whereupon he sought a temporary restraining order to preclude Branch from taking the oath of office. That, too, was denied, and Branch was duly sworn into office. As the case proceeded, the State Elections Board moved to dismiss on the ground that the suit was not timely under two provisions of the Election Code – EL §§9-209 and 12-202.[8] Branch claimed that the action was barred by laches. The Circuit Court accepted the Board's position and dismissed the action as being untimely under EL §9-209.

This Court found that EL §9-209 was not a proper basis for dismissing the action but that §12-202, providing a 10-day window for seeking judicial review, was applicable.

---

[8] EL §9-209, part of the subtitle dealing with ballots, permits a registered voter, within three days after the content and arrangement of the ballot are placed on public display, to seek judicial review of that content or arrangement. Section 12-202, in relevant part, permits a registered voter to seek judicial relief from any act or omission relating to an election on the ground that the act or omission is inconsistent with a law applicable to the election process and may change or has changed the outcome of the election within the earlier of 10 days after the act or omission became known to the voter or seven days after the election results are certified.

18

Because the action was an equitable one, however, laches, rather than direct application of the statutory time period, was the proper focus.

Laches, we said, was an ancient defense in equity against stale claims. It was a necessary invention because, historically, statutes of limitations did not apply to claims in equity, although, as a general rule, courts sitting in equity will apply statutory time limitations in determining, at least as an outside limit, whether laches has run. *Ross, supra,* 387 Md. at 670, 876 A.2d at 704-05. We pointed out that there was no inflexible rule as to what constitutes, or does not constitute, laches, but its existence must be determined by the facts and circumstances of each case. *Id.* at 669, 876 A.2d at 669. Confirming language from *Buxton v. Buxton*, 363 Md. 634. 770 A.2d 152 (2001), we added that, where the delay is of lesser duration than the statute of limitations, the defense of laches "must include an unjustifiable delay and some amount of prejudice to the defendant." *Ross, supra*, 387 Md. at 669, 876 A.3d at 704.

Although declining to adopt a *per se* rule that **any** claim "against a state electoral procedure must be expressed expeditiously," we did apply laches against Ross, noting that the Court had "imposed a duty on parties having grievances based on election laws to bring their complaints forward for pre-election adjudication when possible" and concluding that Ross had not done so. *Id.* at 671-72, 876 A.2d at 705. Ross was aware well before the election that Branch was a certified candidate and that she had failed to file campaign finance reports timely. His decision to wait until after the election to file his suit was (1) unnecessary, (2) prejudiced Branch and the voters of the district, who

19

rightfully relied on the State Board's certification of Branch as a qualified candidate, and (3) prejudiced the State Board as well.

That is not the case here. Unlike Ross, petitioners in this action were not seeking to overturn the results of the election. They accept Bill No. 18-11 as valid law. Their action is solely to seek monetary redress for what they regard as unlawful activity by the county, Leggett, and Lacefield that was prejudicial to them and, through their quest for declaratory judgments, to preclude the county and its officials from engaging in that conduct in the future.

As the Court of Special Appeals noted, there was no prejudice to respondents, or anyone else, from petitioners' waiting until the eve of the election to file their suit. The delay itself was not inordinate, and petitioners' claims can be adjudicated as easily after the election as they could have been before. Indeed, given the considerable amount of discovery necessary to set forth all of the conduct of the respondents and the time required for the parties to assemble their respective cases, navigate through the motion practice, for the court to schedule a trial that took ten days to complete, not to mention post-trial motions and appeals, it likely would have been impossible to resolve the action prior to the election even had the lawsuit been filed near the end of September. The Circuit Court and the Court of Special Appeals were correct in rejecting the defense of laches.

**Government Speech: Scope and Limitations**

The government speech defense is particularly germane to Count 4, which broadly challenged the county's authority to engage in political campaigns of any kind, but it has ripple effects on the other counts as well. As we shall explain, **in the absence of clear and specific prohibitions under State or Federal law**, it provides an affirmative basis for government entities to inform the public of their views regarding legislative measures that may significantly affect their operations or programs, including ballot questions.

The term "government speech," in the context of what is before us, is relatively new and arose as part of First Amendment jurisprudence. The broader question of whether, and to what extent, governments or government officials or agencies are permitted to use public funds or government employees to support or oppose ballot measures or pending legislation that may affect the operations of the government or the agency is not new. The answer to that question traditionally has depended on whether such advocacy, ranging from simple informational bulletins to more aggressive political campaigns, is authorized or prohibited by the assortment of laws governing the agency or the election process.

The early cases dealing with the broader question often involved challenges in State court proceedings to efforts by local school or public works agencies to support bond authorizations on the ballot – authorizations needed, in the agency's view, to allow it to perform its legitimate function. The courts looked closely at the laws governing the agency to determine whether they authorized the expenditure of appropriated money for that purpose and tended to interpret those laws very narrowly. The narrow construction

21

arose, in part, from the view then current, commonly referred to as Dillon's Rule (derived from propositions espoused in 1 Dillon, *Municipal Corporations*, §237, at 448-50 (5th ed. 1911)), that municipal corporations had no inherent powers but only those granted in express words or that necessarily were implied in or incident to those express powers. At least in the early period, there were few, if any, statutes expressly authorizing municipal agencies to advocate for or against ballot measures.

In some instances, that narrow focus was influenced as well by a deep concern whether that kind of advocacy was ever a proper function of government. In enjoining such an effort, a New York trial court expressed the view that "[i]t would be establishing a dangerous and untenable precedent to permit government or any agency thereof to use public funds to disseminate propaganda in favor or against any issue or candidate," adding that "[t]his may be done by totalitarian, dictatorial or autocratic governments but cannot be tolerated, directly or indirectly in these democratic United States of America." *Stern v. Kramarsky,* 375 N.Y.S.2d 235, 239 (S.Ct.N.Y.Co 1975).

A similar concern, expressed with somewhat less flourish, appears in *Stanson v. Mott*, 551 P.2d 1, 8 (Cal. 1976) ("A fundamental precept of this nation's democratic electoral process is that government may not 'take sides' in election contests or bestow an unfair advantage on one of several competing factions"). Citing only four cases, including *Stern*, the *Stanson* Court concluded that "every court which has addressed the issue to date has found the use of public funds for partisan campaign purposes improper, either on the ground that such use was not **explicitly** authorized . . . or that such

22

expenditures are never appropriate." *Id.* at 8-9. (Emphasis added). In a 1929 decision, the Illinois Supreme Court concluded that "[t]he conduct of a campaign, before an election, for the purpose of exerting an influence upon the voters, is not the exercise of an authorized municipal function and hence is not a corporate purpose of the municipality." *Eisenau v. City of Chicago,* 165 N.E. 129, 131 (Ill. 1929).

The emergence of the government speech doctrine, as an element of First Amendment law, added a new dimension to this traditional analysis. The articulation of the concept of government speech emanates, in large measure, from *Johanns v. Livestock Marketing Association, supra*, 544 U.S. 550, 125 S. Ct. 2055, 161 L. Ed.2d 896, although the Court had embraced the concept earlier.[9] It had long been clear, of course that, with very limited exceptions, governments may not regulate or limit, or attempt to regulate or limit, a person's right to speak, particularly on matters of public interest. Two aspects of that general prohibition were the proscription against granting differential access to a public forum based on content or viewpoint and compelling persons to support pronouncements of ideas or causes against their will. If a public body makes a forum available for the expression of opinion by private persons, it may not limit access to that forum based on the content of the opinion sought to be expressed; nor may it compel private persons to express support for a cause or to subsidize a cause – at least a political

---

[9] *See Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 833, 115 S. Ct. 2510, 2519, 132 L. Ed.2d 700, 718 (1995), construing language in *Rust v. Sullivan*, 500 U.S. 173, 194, 111 S. Ct. 1759, 1773, 114 L. Ed.2d 233, 256 (1991) as a recognition that "when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes."

23

one -- with which they disagree.  *See Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 92 S. Ct. 2286, 33 L. Ed.2d 212 (1972); *Wooley v. Maynard*, 430 U.S. 705, 97 S. Ct. 1428, 51 L. Ed.2d 752 (1977).

*Johanns* drew a distinction, in a First Amendment context, between compelling private speech or the subsidization of that speech, on the one hand, and allowing government, through its authorized officials or employees, to express **the government's** views on matters relevant to its function and operation that private persons may oppose but, through their taxes or special assessments, must subsidize, on the other.  The case involved a Federal statute that directed the Secretary of Agriculture to promote the marketing and consumption of beef, the promotional activities to be funded by assessments on the importation and sale of cattle.  Several individuals and associations charged with collecting or paying the assessment filed suit, claiming that some of the advertising funded by the assessments that promoted beef as a generic commodity impeded their effort to promote the superiority of specific kinds of beef.  There was no doubt that the advertising being challenged constituted government speech, not private speech; the question presented was whether compelled funding of that speech nonetheless violated the First Amendment rights of those who had to pay the assessments.

The Court observed that, in all of the cases invalidating exactions to subsidize speech, the speech was, or was presumed to be, that of an entity other than the government itself.  It noted its rulings in *Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 229, 120 S. Ct. 1346, 1353-54, 146 L. Ed.2d 193, 256 (2000)

24

that (1) compelled support of government, even those governmental programs that one does not approve, is "perfectly constitutional," (2) some governmental programs consist of advocating a position, and (3) within that broader principle "it seems inevitable that funds raised by government will be spent for speech and other expression to advocate and defend its own policies."

Building on that base, the *Johanns* Court concluded that citizens may challenge compelled support of private speech "but have no First Amendment right not to fund government speech" and that "is no less true when the funding is achieved through targeted assessments devoted exclusively to the program to which the assessed citizens object." *Id.* at 562, 125 S. Ct. at 2063, 161 L. Ed.2d at 908. Finally, for our purposes, the Court rejected the notion that "every instance of government speech must be funded by a line item in an appropriations bill." *Id.* at 563, 125 S. Ct. at 2064, 161 L. Ed.2d at 909.

The principles announced in *Johanns* were confirmed by the Court in subsequent cases. *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467-68, 129 S. Ct. 1125, 1131, 172 L. Ed.2d 853, 861 (2009). Citing Justice Scalia's comment in his concurring Opinion in *National Endowment for Arts v. Finley*, 524 U.S. 569, 598, 118 S. Ct. 2168, 2184, 141 L. Ed.2d 500, 523 (1998), that "[i]t is the very business of government to favor and disfavor points of view," the *Pleasant Grove City* Court added that "it is not easy to imagine how government could function if it lacked this freedom." Importantly, the Court did note that there may be constraints on government speech. It must comport with the Establishment Clause of the First Amendment, and (1) "[t]he

25

involvement of public officials in advocacy may be limited by law, regulation, or practice," and (2) "a governmental entity is ultimately accountable to the electorate and the political process for its advocacy." *Id.* at 468-69, 129 S. Ct. at 1132, 172 L. Ed.2d at 861 (quoting, in part, from *Southworth, supra,* 529 U.S. at 235, 120 S. Ct. at 1357, 146 L. Ed.2d at 209.

At least two Federal Courts of Appeals and several U.S. District Courts have applied those precepts to sustain activities by local governments in support of ballot measures or pending legislation relevant to their operations or programs. In *Kidwell v. City of Union*, 462 F.3d 620 (6th Cir. 2006), a resolution by the Union City Council establishing a separate fire department for the City was petitioned to referendum by groups favoring the then-current situation, under which fire and emergency services were provided by a neighboring township.

The campaign was described as a "lively" one, in which opponents of the Resolution organized a "Vote Yes" campaign, which would nullify the Resolution, and the Council expended public funds urging citizens to "Vote No," to sustain it. Banners and leaflets were distributed to the public; advertisements were placed in the local newspaper. The Resolution was sustained, but the battle raged on, and the Council continued to use public funds to oppose subsequent ballot initiatives regarding land acquisition and a tax levy to fund the new fire department. The opponents sued, challenging the town's use of public funds to defeat the referendum.

Affirming the trial court's dismissal of the action, the Sixth Circuit Court began by quoting the comment in *Rosenberger* that, when a government appropriates public funds to promote a particular policy, it is entitled to say what it wishes. Citing *NAACP v. Hunt*, 891 F.2d 1555 (11th Cir. 1990), the Court recognized three categories of action that would constitute an infringement of free speech and thus limit the right of government speech: (1) abridgement of equality by granting differential access to public fora based on viewpoint; (2) monopolization of the marketplace of ideas; and (3) compulsion of citizens to support candidates, parties, ideologies, or causes that they oppose. In further discussion, the Court concluded that none of those limitations were applicable.

The Court recognized that elections raise unique Constitutional issues and that, where the government uses its official voice "in an attempt to affect the identity of the people's elected representatives," it can subvert one of the principles underlying democratic society, but concluded that "[a]lthough these principles require some limit on the government's power to advocate during elections, they do not require a bright line rule barring such speech, at least where the government speaks within the scope of its governance functions." *Kidwell, supra*, 462 F.3d at 625. The issues on which the City advocated, the Court held, were germane to the mechanics of its function of providing emergency services, and the advocacy was therefore permissible.

In *Page v. Lexington County School District One*, 531 F.3d 275 (4th Cir. 2008), the Court rejected a challenge to the school district's use of its resources – e-mails, website links -- to convey its opposition to a bill pending in the State (South Carolina) legislature

27

providing tax credits for private and home schooling.  The school district was concerned that the bill would undermine public education.  A proponent of the bill requested that the district include his viewpoint on its informational distribution system, and, when the district refused, a lawsuit was filed.

Although the principal issue before the Court was whether the message of the school district constituted government speech, which the Court held it did, the significance of the case, for our purposes, lies in the Court's rejection of the argument that the government speech doctrine does not apply when the government attempts to influence legislation.  Citing *Kidwell* and two U.S. District Court opinions, the Court noted that "[m]any courts have rejected First Amendment challenges to government speech involving advocacy regarding ballot measures" and that such speech regarding legislation also fits within the government speech doctrine.  *Page, supra*, 631 F.3d at 287. *See* also *Cook v. Baca*, 95 F. Supp.2d 1215 (D.N.M. 2000); *Ala. Libertarian Party v. City of Birmingham*, 694 F. Supp. 814 (N.D. Ala. 1988); *Adams v. Me. Municipal Assoc.* 2013 WL 9246553 (D. Me. Feb. 14, 2013).

The two doctrines or approaches have retained their separate functions, but there clearly has been some confluence of those doctrines.  The right of government to express its views on matters relating to its legitimate operations and to authorized programs, even in the context of supporting or opposing ballot measures or pending legislation, has been recognized as an adjunct to its legitimate operations or programs, and, at least in some instances, laws defining the general powers of governmental bodies are being expanded

28

and construed more liberally than in the past. *See Burt v. Blumenauer*, 699 P.2d 168, 172 (Ore. 1985); *Vargas v. City of Salinas*, 205 P.3d 207 (Cal. 2009).

**State and Local Law**

Ultimately, whether a State or local government, through its agencies or officials, can use public funds or public employees to engage in government speech for the purpose of promoting or opposing ballot issues or pending legislation depends on whether the applicable State or local law negates or limits such authority. Except as to First Amendment or other supervening Federal issues, the government speech doctrine was not intended to override valid laws articulating, or that may limit, the powers of the government agency or official. We need to look, then, at the laws governing the powers of the Montgomery County government and its County Executive that petitioners claim preclude the activity complained of here.

The thrust of petitioners' complaint – what they regard as the "central issue" in the case -- set forth most directly in Count 4 of the amended complaint, is that the county itself had no authority to become involved in a political campaign. Their view is that Montgomery County's governmental power is limited strictly to the express powers legislatively delegated to charter counties pursuant to Art. XI-A §2 of the Maryland Constitution, that the use of county funds and county personnel for the political activity complained of is not among those delegated powers, and that the county therefore does not have them. If the county had no such authority, it follows, in petitioners' view, that

29

Leggett and Lacefield had no authority to do what they did. Beyond that vicarious lack of authority, petitioners contend that, in implementing the county's political activity, Leggett's and Lacefield's conduct actually violated the State election laws, State and county laws governing political activity by county employees, and provisions of the county Charter.

Scope of Delegated Powers Under Art. XI-A

As a preface, we start with the facts that (1) Montgomery County is, indeed, a charter county; (2) it adopted and, from time to time has amended, its Charter pursuant to Art. XI-A of the Maryland Constitution; and (3) pursuant to Art. XI-A and its Charter, the county may exercise, in the manner established in its Charter, the powers delegated to charter counties by the General Assembly. Those powers are now codified mostly in LG Title 10, and one does not find among them any express and specific power to advocate for or against ballot measures. Nor is there anything in those delegated powers expressly negating or limiting such authority.

Those facts are undisputed. The crux of this "central issue" is what to make of the silence. As noted, petitioners' view is that, if the power is not expressly and affirmatively stated, it does not exist; respondents argue that a power may be implied from other powers or from Art. XI-A itself, especially as it is not expressly negated. Relying on *Perry v. Board of Appeals*, 211 Md. 294, 303, 127 A.2d 507, 511 (1956), petitioners urge that the county has "only so much [police power] as the Legislature has **expressly** delegated to it" -- that is "granted **in express words**" or that is "necessarily or fairly

30

implied in or incident to the powers **expressly** granted." (Emphasis added).  They assert as well that the powers expressly delegated under Art. XI-A §2 must be construed in a very narrow, constricted manner.  We note first, that *Perry* did not address the home rule powers of a **county**, but of a **village** – a municipal corporation.

More important, later decisions of this Court have expressed a broader view of what was intended in Art. XI-A.  In *Ritchmount Partnership v. Board*, 283 Md. 48, 388 A.2d 523 (1978), the Court stated that the intent of that Article – the Home Rule Amendment – was "to secure to the citizens of Maryland 'the fullest measure of local self-government in respect of their local affairs'" and that the legislative powers delegated by the General Assembly pursuant to §2 of Art. XI-A "are those usually associated with the objects of government -- that is, powers to legislate for the benefit of the health, safety and general welfare of the local community."  *Id*, at 56-57, quoting in part from *State v. Stewart*, 152 Md. 419, 422, 137 A. 39, 41 (1927).

More recently, in *Chesapeake Bay Found. v. DCW Dutchship*, 439 Md. 588, 97 A.3d 135 (2014), we recounted what had been stated in *Ritchmount*  and noted that this Court and the Court of Special Appeals "have been unwilling to construe narrowly the powers delegated to counties" but instead have viewed the delegated powers as "an expansive grant of authority."  *Chesapeake Bay Found.* at 601-02, 97 A.3d at 143. Quoting from *Montgomery Citizens League v. Greenhalgh*, 253 Md. 151, 160, 252 A.2d 242, 246 (1969), we observed that "[g]ratification would not be afforded the purposes of home rule or the reasons which prompted it if the language of [the Express Powers Act]

31

were not to be construed as a broad grant of power to legislate on matters not specifically enumerated in [the laws governing charter counties]." *Chesapeake Bay Found.*, 439 Md. at 602-03, 97 A.3d at 143.

*See* also *Annapolis v. Anne Arundel County*, 347 Md. 1, 14, 698 A.2d 523, (2007), observing that, although the authority of charter counties to budget and appropriate funds "is not expressly granted by the Express Powers Act or any other enactment of the General Assembly," it "is implicit in Article XI-A and is an inherent power of all Maryland counties."

These cases make clear that the powers of a charter county are not, as petitioners contend, limited to a narrow and constricted reading of the list of express powers delegated following the ratification of Art. XI-A in 1915. We need look no further in that regard than what is now codified as LG §10-206, authorizing the county council to pass any ordinance not inconsistent with State law that may aid in executing and enforcing any power in Title 10 of that Article **or** that "may aid in maintaining the peace, good government, health, and welfare of the county." In *Greenhalgh, supra*, 253 Md. at 160, 252 A.2d at 246, this Court viewed that grant, then codified as Art. 25A, §5(S) of the Md. Code, as a statutory authority to pass all ordinances the Council "deems expedient under the police power," except as limited by State law. Under § 201 of the Montgomery County Charter, the County Executive, who is the chief executive officer of the county, is charged with faithfully executing those laws.

What we have, then, is a law enacted by the County Council modifying the requirement of bargaining on the effect of the county's exercise of rights expressly reserved to it in the collective bargaining law -- a law intended to correct what the Council found to be behavior by FOP and its members that was disruptive to the proper running of the Police Department and not conducive to public safety. FOP succeeded in petitioning that law to referendum and was mounting a substantial political campaign to persuade the voters to nullify it. The County Executive, in aid of preserving that law and countering that effort, directed the expenditure of funds lawfully appropriated by the Council to the County Office of Public Information, to inform the voters of the impact of nullifying the law and, for the welfare of the county, advocate for its confirmation. We find that to be a proper use of government speech that is consistent with the authority delegated to the Council by the General Assembly and to the County Executive in the County Charter.

We add, as a caution, that we are not dealing here with an attempt by the county to use public funds or public employees to support or oppose (1) any partisan political cause, such as the election of particular candidates for office, or (2) a politically-tainted ballot measure expressing disputed principles of social policy that would neither hamper nor enhance the operations or programs of the county government in any material way. That kind of advocacy, we agree, is not a proper function of government and is not within the permissible ambit of government speech.

<u>Other State and County Laws</u>

33

We shall address petitioners' other allegations of unauthorized or unlawful activity on the part of respondents in the context of the counts in their amended complaint.

Counts 1, 4, and 5 charge that the activities of Leggett and Lacefield violated Title 13 of the Election Law Article. In particular, they asserted that the two of them constituted a political committee and campaign finance entity and made no effort to comply with requirements pertaining to those entities. In his Memorandum, the trial judge found that to be the case. Although concluding that EL Title 13 did not apply to the county, itself, and acknowledging that all of Leggett's and Lacefield's actions were conducted on behalf of the county government and in reliance on advice from the County Attorney and the Attorney General's Office that Title 13 did not apply to the county, he nonetheless, without any analysis, concluded that Leggett and Lacefield individually were required to comply with the requirements of Title 13 and entered a declaratory judgment to that effect.

The Court of Special Appeals disagreed, largely on the basis that, under the government speech doctrine, the county was authorized to advocate in favor of sustaining the law, that it could only do that through its officials and employees, and, as Leggett and Lacefield were acting solely as agents of the county, they were not subject to the election law requirements.

There are statutes in other States that speak directly to whether local governments may use public funds to advocate for or against ballot measures or pending legislation. *See*, for example, Ariz. Rev. State, Ann. §9-500.14 (2008); Cal. Gov't Code, 54964;

34

Colo. Rev. Stat. §1-45-117(1)(a)(I); Mass. Gen. Laws ch.55 §§1-42; Or. Rev. Stat. §260.432 (2012). There is no express prohibition of such activity by local governments in Maryland. Nor can we find anything in the text of the statutes in EL Title 13 to indicate that the General Assembly intended for those statutes to apply to local governments. As a general proposition, "[t]his Court has consistently held that the word 'person' in a statute does not include the State, its agencies **or subdivisions** unless an intention to include these entities is made manifest by the Legislature." *Unnamed Physician v. Comm'n,* 285 Md. 1, 12, 400 A.2d 396, 402 (1979) (Emphasis added). *See also WSSC v. Phillips*, 413 Md. 606, 622, 994 A.2d 411, 421 (2010).

Apart from that general proposition, we are especially averse to finding such an intent in this regard, for to do so would run roughshod over budgetary and fiscal controls enacted pursuant to county charters and necessary to the operation of county government. EL §13-207, for example, prohibits a political committee from "receiv[ing] or disburs[ing] money or any other thing of value unless the political committee is established in accordance with the requirements of this section." If applicable to county officials acting solely in their official capacity, that would preclude them from receiving and spending money lawfully appropriated by the legislative body of the county, for any purpose. The required structure of a political committee—a chair, treasurer, campaign manager – and the duties of those persons are inconsistent with the structure of county government. The requirement in EL §13-220 regarding campaign accounts is likely

35

inconsistent with fiscal controls established by county law enacted pursuant to its Charter.

The Legislature has recognized, in a related context, that advocacy in regard to legislative matters by county officials, when undertaken solely in an official capacity, is permissible and that controls imposed on private persons when engaging in such activity are not applicable to them. *See* §5-702(b) of the General Provisions Article, exempting from the laws regulating lobbyists "an appearance as part of the official duties of an elected or appointed official or employee of the State, a political subdivision of the State, or the United States, to the extent that the appearance is not on behalf of any other entity."

In summary, if EL Title 13 does not apply to a county, it surely cannot apply to authorized county officials when acting solely in their official capacity, for it is only through those officials that the county can exercise its powers. The Court of Special Appeals was correct in holding that Leggett and Lacefield did not constitute a political committee and were not required to comply with the provisions of EL Title 13.

We turn, then, to the complaints that Leggett's and Lacefield's use of other county employees in furtherance of the county's advocacy efforts violated various laws governing political activity by county employees, in particular former Md. Code, Art. 24 §13-105 (current LG §1-304) (Count 2), §§405, 406, and 408 of the County Charter, §19A-14 of the County Code, and County Personnel Regulation 3-8 (Count 6). We find no merit in those complaints.

LG §1-304, in relevant part, prohibits employees of governmental entities from engaging in political activity while on the job during working hours. Sections 405, 406, and 408 of the County Charter provide, in relevant part, that no county officer or employee shall be obligated to contribute to a political campaign or render political service (§405) or cause any officer or employee to do or perform any service or work outside of the officer's or employee's public office or employment (§406), and that all officers and employees shall devote their entire time during official working hours to the performance of their official duties (§408). Section 19A-14 of the County Code prohibits county employees from using the prestige of their office for private gain, using county property or work time for personal use, or intimidating or discriminating against any person for the purpose of interfering with that person's freedom to engage in political activity. Finally, County Personnel Regulation 3-8 generally precludes county employees from engaging in political activity during working hours and using county property for private political purposes.

There was no evidence that any of those provisions were violated by Leggett, Lacefield, or other county employees operating pursuant to instructions from Leggett or Lacefield. As we have concluded that Leggett's and Lacefield's activities, on behalf of the county, were an authorized and proper manifestation of legitimate government speech, it follows that any assistance in those activities by subordinate county employees at the direction of Leggett or Lacefield also was a proper county function and fell within the scope of their official duties.

<u>Counts 7, 8, 9, and10; Attorneys' Fees</u>

As noted, Counts 7 through 10 of the amended complaint sought not only declaratory relief but monetary damages from Leggett and Lacefield based on their allegedly wrongful conduct. The trial judge denied such relief based on qualified immunity. The Court of Special Appeals, having found that there was no wrongful conduct on their part, found as well that there was no basis for such relief and declined to address any issue of immunity. We agree. As to petitioners' request for attorneys' fees (Counts 7, 8, and 9), as they have not prevailed on any claim in this case, there is no basis for an award of attorneys' fees.

<u>CONCLUSION</u>

The mandate of the Court of Special Appeals was to reverse the Circuit Court judgment. The legal conclusions reached by the appellate court were correct, but its judgment was technically incorrect. Counts 1 through 6 sought declaratory judgments, and declaratory judgments were, in fact, issued on those counts. Even though they were legally in error, the correct remedy is not simply to reverse them but to vacate them and remand the case for the entry of proper declaratory judgments. As to Counts 7 through 10, the Circuit Court found wrongdoing on the part of Leggett and Lacefield but denied relief because of its finding of qualified immunity. The denial of relief was correct, but for the wrong reason. We think that a more structured mandate is required.

JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS (1) TO REVERSE THE JUDGMENTS ENTERED BY THE CIRCUIT COURT ON ALL COUNTS; (2) TO REMAND THE CASE TO THE CIRCUIT COURT WITH INSTRUCTIONS TO ENTER DECLARATORY JUDGMENTS ON ALL COUNTS THAT SOUGHT THEM IN CONFORMANCE WITH THE OPINION OF THIS COURT AND TO ENTER JUDGMENT DENYING MONETARY RELIEF UNDER COUNTS 7 THROUGH 10 ON THE GROUND THAT LEGGETT AND LACEFIELD DID NOT VIOLATE ANY OF THE LAWS ALLEGED BY PETITIONERS; COSTS IN THIS COURT, THE COURT OF SPECIAL APPEALS, AND THE CIRCUIT COURT TO BE PAID BY PETITIONERS.